[No. S006588. Feb. 3, 1993.]

AVERELL SMITH et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA,
Plaintiff, v.
THE SMALL CLAIMS COURT FOR THE BERKELEY-ALBANY
JUDICIAL DISTRICT OF ALAMEDA COUNTY, Defendant;
BRAD SPARKS et al., Real Parties in Interest.

844

**COUNSEL**

Brad Sparks, in pro. per., Arlo Hale Smith, Timothy A. DeWitt, Ronald A. Zumbrun, Anthony T. Caso and Richard M. Stephens for Plaintiffs and Appellants and for Real Parties in Interest.

Martin A. Schainbaum, Daniel J. Popeo and John C. Scully as Amici Curiae on behalf of Plaintiffs and Appellants and Real Parties in Interest.

James E. Holst, Christine Helwick, Fred Takemiya, Himelstein, Savinar, Petrocelli & Curtice and Mark Himelstein for Defendants and Respondents.

**OPINION**

**PANELLI, J.**—Students at the Berkeley campus of the University of California are required to pay an activities fee. Part of the income from the fee is used to support student groups that pursue political and ideological causes. The student plaintiffs in this case object both to the imposition of the fee and to the manner in which it is used.

We reject plaintiffs' challenge to the imposition of the fee. The authority to levy a student activities fee is well within the broad powers of self-governance that the citizens of California have granted the University's Regents under the state Constitution.

The Regents' freedom to govern the University, however, is not the only freedom at stake in this case. Also at stake is the freedom of students not to

be compelled and coerced to subsidize political and ideological causes. The dissenting opinion misleadingly asserts that this case is about the "dissemination of controversial *ideas*" (dis. opn. of Arabian, J., *post*, at p. 869) and wrongly accuses the majority of somehow restricting speech. In fact, the case has nothing to do with restrictions on speech. It goes without saying that all students are free to organize, to promote their ideas, and to seek by all legal means to persuade others that their views are correct. Moreover, the Regents may continue to fund student political activities through the fees of students who do not object. However, the constitutional guaranties of free speech and association do not permit the state to make speech a matter of compulsion and coercion. As the present system of funding student activities has that effect, it cannot be continued without affording dissenting students an appropriate remedy.

At the heart of the dissenting opinion is a frank proposal to sacrifice students' constitutional right not to be compelled to support political causes in order to teach them about the "fundamental republican virtues upon which this nation was founded." (Dis. opn. of Arabian, J., *post*, at p. 870.) The irony of that proposal speaks for itself.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs in this action were students at the University of California at Berkeley (University), or taxpayers, during 1981. Defendants are the Regents of the University of California (Regents), the Associated Students of the University of California (ASUC), and various officers of the University. The Regents govern the University pursuant to authority granted by the state Constitution. (Cal. Const., art. IX, § 9.) The ASUC is the organization authorized by the Regents to administer student government and student extracurricular affairs.

Since 1955, every student at the University has paid a mandatory, nonrefundable fee to support the ASUC each academic period as a condition of enrollment. For many years, payment of the fee entailed automatic membership in the ASUC. Shortly after this litigation began, however, the University changed its procedures to permit each student to accept or to decline ASUC membership. Payment of the fee remains mandatory.

The Regents transfer most of the income from the mandatory fee to the ASUC. In 1982, when this case was tried, the amount of the fee was $12.50 per student per quarter. The total amount collected from students and transferred by the Regents to the ASUC in the 1981-1982 academic year was $607,635. The ASUC's total expenditures for the same period were

$1,016,569. The difference between the income from the mandatory fee and the ASUC's total expenditures is attributable to the ASUC's many business enterprises, which include the Student Union Building, a bookstore, and a ski lodge. In its operations the ASUC employs a full-time staff of over 85 persons and a part-time staff of over 250.

The ASUC uses its income, including the proceeds of the mandatory fee, to support a wide variety of activities in addition to student government. The ASUC is, for example, active in politics through the ASUC Senate, the governing body of 30 elected student representatives. Besides administering student affairs, the ASUC Senate debates and passes resolutions on local, state, and national issues. Issues on which the ASUC Senate has taken positions include, for example, gay and lesbian rights, the proposed Equal Rights Amendment, gun control, the reelection of a particular United States Representative, a municipal initiative to legalize marijuana, and the treatment of political prisoners in foreign countries.

The ASUC also subsidizes lobbying by two affiliated groups, the University of California Lobby and the ASUC Municipal Lobby. These groups seek to influence legislation pending before the state and municipal governments, respectively. Through the former, the ASUC has lobbied the state Legislature in favor of using registration fees to fund abortions, against rent discrimination, against budget cuts for the University, and in favor of mandatory student fees. Through the latter, the ASUC has lobbied the City of Berkeley on a nuclear freeze initiative, public transportation fares, city investment policy, zoning, and rent control, and has endorsed student candidates for municipal office.

In addition to its own activities, the ASUC also uses income from mandatory fees to subsidize approximately 150 student activity groups. Any four students at the University may form such a group and register it with the University. All registered groups may, but need not, request funding from the ASUC. Student groups pursue diverse interests, including academic subjects, culture, sports, games, and politics. To obtain funding, a student group submits a budget to the ASUC Finance Committee for review, which forwards its recommendation to the ASUC Senate for approval. Upon approval, a student group is eligible to receive reimbursement for actual expenses as incurred. The ASUC's rules permit reimbursement for 11 categories of expenses: "(1) personal services, (2) stationery and supplies, (3) telephone, (4) travel, (5) dues and subscriptions, (6) postage, (7) equipment rental, (8) advertising, (9) programs and printing, (10) facilities rental, and (11) other."

Most of the registered student groups are devoted to academic, cultural, or recreational pursuits. The Physics Students Society, the Spanish Club, the

Cal Ski Club, and the Chess Club are random, typical examples. However, other groups pursue frankly political or ideological goals. At trial, plaintiffs objected to the ASUC's funding of 14 such groups: Amnesty International; Berkeley Students for Peace; Campus N.O.W. (National Organization for Women); Campus Abortion Rights Action League; Gay and Lesbian League; Progressive Student Organization; REAP (Radical Education and Action Project); Spartacus Youth League; Students Against Intervention in El Salvador; Students for Economic Democracy; UC Berkeley Feminist Alliance and Women Organized Against Sexual Harassment; UC Sierra Club; Conservation and Natural Resources Organization; and Greenpeace Berkeley. Some of these organizations are affiliated with state, national, or international organizations.

The procedural history of this action, insofar as it relates to the issues before us, is as follows: On April 16, 1979, plaintiffs Averell Smith, Marina Trepetin, Arlo Hale Smith, and Adlai Smith filed suit in the Superior Court of Alameda County against the Regents, the ASUC, and certain individual officers of the University. In their action, plaintiffs challenged the Regents' collection and use of the mandatory fee as violating the First Amendment to the United States Constitution,[1] article I, section 2, subdivision (a),[2] article I, section 3,[3] and article IX, section 9, subdivision (f),[4] of the California Constitution, and various other state constitutional and statutory provisions. Plaintiffs sought declaratory, injunctive, and all other appropriate relief. On May 23, 1980, five additional student plaintiffs (Brad Sparks, Jimmy Hom, Emily Taylor, Alexa Smith, and Thomas Kistler) filed individual actions in the Berkeley-Albany Small Claims Court seeking refunds of mandatory fees. All actions were subsequently consolidated by stipulation in the superior court.

On March 25, 1982, the superior court summarily adjudicated that the Regents' collection of the mandatory fee was legal. The court then tried, without a jury, plaintiffs' claims regarding the use of the fee. The court expressly found that "there ha[d] been isolated instances in the past wherein University and ASUC Rule[s] and Regulations ha[d] been violated in areas

---

[1] "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

[2] "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of the speech or press."

[3] "The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."

[4] ". . . The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs . . . ."

involving partisan political activities, ballot measure positions and alleged misuse of [the] University['s] name in connection with student activities . . . ." Nevertheless, the court entered judgment for defendants. The Court of Appeal affirmed. We granted review and deferred briefing pending the United States Supreme Court's disposition of *Keller* v. *State Bar of California* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228], which involved a challenge to the State Bar of California's use of mandatory dues to support political and ideological activities. We then remanded the case for reconsideration in light of the high court's opinion. When the Court of Appeal once again affirmed, we granted review.

## II. Discussion

### A. *Collection of the Mandatory Fee.*

Plaintiffs Kistler and Taylor contend that the Regents do not have sufficient authority to collect a mandatory student activities fee. The contention lacks merit. The California Constitution expressly invests the Regents with "full powers of organization and government" over the University. (Cal. Const., art. IX, § 9, subd. (a).) This general grant of power, which has been described as giving the Regents "virtual autonomy in self-governance" (*Regents of University of California* v. *City of Santa Monica* (1978) 77 Cal.App.3d 130, 135 [143 Cal.Rptr. 276]), is plainly adequate to permit the Regents to levy a student activities fee in the absence of a constitutional or statutory prohibition.

Plaintiffs suggest that language with the effect of prohibiting the collection of a mandatory fee can be found in several authorities, namely, article IX, section 9, subdivision (f), of the state Constitution;[5] section 13 of the Organic Act establishing the University (Stats. 1867-1868, ch. CCXLIV, § 13, pp. 253-254);[6] and our decision in *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 213-223 [130 Cal.Rptr. 697, 551 P.2d 1]. The constitutional and statutory provisions just cited declare, in essence, that the University shall be kept free of political and sectarian influence. *Stanson* v. *Mott, supra,* held that a state official acted improperly by spending public funds to campaign in favor of a ballot proposition. While these authorities might support an argument against some of the uses to which the fee has been put, they do not appear to affect the Regents' power to collect a fee, assuming its use is proper.

---

[5]See footnote 4, *ante.*

[6]"[N]o sectarian, political or partisan test shall ever be allowed or exercised in the appointment of Regents, or in the election of professors, teachers, or other officers of the University, or in the admission of students thereto, or for any purpose whatsoever . . . ." (*Id.,* at p. 254.)

We thus turn to plaintiffs' claims regarding the use of the fee.

B. *ASUC Support of Political and Ideological Groups.*

 Plaintiffs contend that the ASUC uses income from the mandatory fee in several ways that violate their rights to freedom of speech and association. We consider first the use of such fees to subsidize student groups devoted to political and ideological causes.

This case involves two important principles. (3) The first is that the government may not compel a person to contribute money to support political or ideological causes. (See, e.g., *Keller* v. *State Bar of California, supra,* 496 U.S. at pp. 9-10 [110 L.Ed.2d at pp. 11-12] *(Keller)*; *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209, 234-235 [52 L.Ed.2d 261, 283-285, 97 S.Ct. 1782] *(Abood).)* Such contributions are a form of speech, and compelled speech offends the First Amendment,[7] just as do restrictions on speech. (E.g., *Keller, supra,* 496 U.S. at pp. 9-10 [110 L.Ed.2d at pp. 11-12]; *Abood, supra,* 431 U.S. at pp. 234-235, & 235 fn. 31 [52 L.Ed.2d at pp. 283-285]; *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 247-258 [41 L.Ed.2d 730, 735-741, 94 S.Ct. 2831] [state may not compel a newspaper to print a political candidate's reply to an editorial]; *Torcaso* v. *Watkins* (1961) 367 U.S. 488, 489-496 [6 L.Ed.2d 982, 983-988, 81 S.Ct. 1680] [state may not compel civil servants to affirm a belief in God]; *Board of Education* v. *Barnette* (1943) 319 U.S. 624, 630-642 [87 L.Ed. 1628, 1633-1640, 63 S.Ct. 1178, 147 A.L.R. 674] [state may not compel students to salute the flag].) Courts have often stressed this principle by repeating Thomas Jefferson's view that " ' "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." ' " (Brant, James Madison: The Nationalist (1948) p. 354, as quoted in *Abood, supra,* 431 U.S. at p. 235, fn. 31 [52 L.Ed.2d at p. 284]; see also *Keller, supra,* 431 U.S. at p. 10 [110 L.Ed.2d at pp. 11-12], and *Chicago Teachers Union* v. *Hudson* (1986) 475 U.S. 292, 305, fn. 15 [89 L.Ed.2d 232, 246, 106 S.Ct. 1066] *(Hudson).)*

 The second principle is that the Regents, to be effective, must have considerable discretion to determine how best to carry out the University's educational mission. Indeed, we have said that "the power of the Regents to operate, control, and administer the University is virtually exclusive." (*Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 540

[7]The state Constitution also guarantees speech, associational, and political rights in comparable, but independent, provisions. (Cal. Const., art. I, §§ 2, subd. (a), 3; see *id.,* art. I, § 24 ["Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution"].) Because we find that plaintiffs are entitled to relief on other grounds, we need not address the effect of these provisions.

[91 Cal.Rptr. 57, 476 P.2d 457], internal quotation marks omitted; see also *San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277].)

■ These principles conflict in the case before us. Plaintiffs, invoking their constitutional right not to be compelled to speak, argue that the use of mandatory fees to subsidize student political groups impermissibly burdens that right. The Regents, relying on their authority to define the University's educational mission, acknowledge the burden on plaintiffs' rights but argue that student political activity offers educational benefits that justify the burden.

Our analysis begins with a line of high court decisions that arose in the context of agency-shop agreements. Under these decisions, a state may compel employees who obtain the benefits of a union's collective bargaining efforts to pay service fees to the union, even though such employees may choose not to join. (*Abood, supra,* 431 U.S. at pp. 217-223 [52 L.Ed.2d at pp. 272-277]; see also *Hudson, supra,* 475 U.S. at p. 301 [89 L.Ed.2d at pp. 243-244].) The court has explained this result as justified by the state's interest in facilitating collective bargaining and preventing "free riders." (*Abood, supra,* 431 U.S. p. 222 [52 L.Ed.2d at pp. 275-276]; see also *id.,* at pp. 220-221 [52 L.Ed.2d at pp. 274-275].) However, the constitutional prohibition against compelled speech limits the uses to which a mandatory fee may be put: When the state does compel nonmembers to support a union financially, the nonmembers may prevent the union from using their contributions to fund the expression of political and ideological views unrelated to collective bargaining. (*Id.,* at p. 234 [52 L.Ed.2d at pp. 283-284]; see also *Hudson, supra,* 475 U.S. at pp. 301-302 [89 L.Ed.2d at pp. 243-244].)

■ Because the use of a mandatory fee implicates freedom of association, strict scrutiny applies. As the high court reiterated in *Hudson, supra,* "[i]nfringements on freedom of association 'may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.' " (475 U.S. at p. 303, fn. 11 [89 L.Ed.2d at p. 245], quoting *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 623 [82 L.Ed.2d 462, 104 S.Ct. 3244].) Thus, even when the government has a sufficiently compelling interest to require a person to subsidize an organization against his or her will, the resulting burden on freedom of association "requires that the procedure be carefully tailored to minimize the infringement." (*Hudson, supra,* 475 U.S. at p. 303 [89 L.Ed.2d at p. 245].)

The principle that underlies the agency-shop decisions took sharper focus in *Keller, supra,* 496 U.S. 1, which concerned the mandatory payment of

dues by lawyers to a bar association. The plaintiff lawyers objected to the bar's use of dues to fund lobbying on issues of general social concern that had little, if anything, to do with the practice of law, such as gun control, abortion, and prayer in public schools. The bar defended its lobbying as a permissible exercise of its statutory authority to "aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice." (*Id.*, at p. 15 [110 L.Ed..2d at p. 15], internal quotation marks omitted.)

The high court rejected the bar's argument. In so doing, the court made clear that the use of mandatory contributions must be "germane," not simply to any purpose the organization chooses to declare for itself, but "to the purpose for which compelled association was justified" as a matter of constitutional law. (*Keller, supra*, 496 U.S. at p. 13 [110 L.Ed.2d at p. 14], citing *Abood, supra*, 431 U.S. 209; see *Abood, supra*, at pp. 219, 235 [52 L.Ed.2d at pp. 273-274, 284-285].) In other words, the existence of a compelling interest sometimes permits the state to require a person to associate with an organization, or to support it financially, despite the general constitutional prohibition against laws with that effect. However, that one's support may be compelled for some purposes does not mean that one must also subsidize every activity the organization in question chooses to undertake.

To illustrate, the state interests that justified compulsory bar membership in *Keller* were the specific goals of regulating the legal profession and improving the quality of legal services. (496 U.S. at p. 13 [110 L.Ed.2d at pp. 13-14].) As the high court explained, "[t]he State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity." (*Id.*, at p. 14 [110 L.Ed.2d at p. 14].) Thus, the high court rejected the State Bar's argument that its lobbying on matters of general social interest, for example, "to advance a gun control or a nuclear weapons freeze initiative," could be justified as germane to the Bar's broader goal of improving the administration of justice. (*Id.*, at pp. 14-16 [110 L.Ed.2d at pp.14-16].)

To summarize, *Keller* and *Abood* teach that the state may compel a person to support an organization if there is a sufficiently compelling reason to do so, and that the organization's use of mandatory contributions must be germane to the purposes that justified the requirement of support. (*Keller, supra*, 496 U.S. at pp. 13-14 [110 L.Ed.2d at pp. 13-14]; *Abood, supra*, 431 U.S. at pp. 217-223, 232-237 [52 L.Ed.2d at pp. 272-277, 282-286].) ▪ The Regents argue that their use of mandatory fees to support student

political groups satisfies these principles. They reason that the University's purpose is to educate, and that the funding of such groups by the ASUC provides educational opportunities. Participation in such groups, according to the Regents, gives students a chance "to express their views on campus, to participate in campus administrative positions, to provide self-education in government processes, to develop social skills, to inform the student body about a variety of issues, and to ensure freedom of expression and association."

While *Keller* and *Abood* hold that activities supported by mandatory contributions must be "germane" to the constitutionally relevant function, it does not follow, as the Regents argue, that everything "germane" is automatically permissible without the need for further inquiry. *Keller* and *Abood* involved much lighter burdens on speech and associational rights than those at issue here. A state bar's regulatory function, as in *Keller*, and a labor union's collective bargaining function, as in *Abood*, can be narrowly defined. Thus, to be compelled to pay for activities "germane" to those functions does not substantially burden an unwilling supporter's speech and associational rights. While the unwilling supporter may receive unwanted professional or economic assistance, he or she remains free not to speak or to support others' speech on political and ideological issues. In contrast, the University's educational function is extremely broad; it potentially encompasses all of life. By recognizing that student political activity can be "germane" to education we run the risk of sanctioning a much greater burden on speech and associational rights than the high court necessarily contemplated when it used that term. (*Keller, supra*, 496 U.S. at pp. 13-14 [110 L.Ed.2d at pp. 14-16], citing *Abood, supra*, 431 U.S. 209; see also *Abood, supra*, at pp. 219, 235 [52 L.Ed.2d at pp. 273-274, 284-285].)

The solution to this problem is to set a rational limit on the use of mandatory fees. We can do this by recognizing what is obviously true, namely, that a group's dedication to achieving its political or ideological goals, at some point, begins to outweigh any legitimate claim it may have to be educating students on the University's behalf. To fund such a group through mandatory fees will usually constitute more of a burden on dissenting students' speech and associational rights than is necessary to achieve any significant educational goal. The University can teach civics in other ways that involve a lesser burden on those rights, or no burden at all.

Indeed, this is the approach that courts have followed in the two cases that are fairly closely on point. (*Carroll* v. *Blinken* (2d Cir. 1992) 957 F.2d 991, cert. den. (1992) __ U.S. __ [121 L.Ed.2d 224, 113 S.Ct. 300]; *Galda* v.

*Rutgers* (3d Cir. 1985) 772 F.2d 1060, cert. den. (1986) 475 U.S. 1065 [89 L.Ed.2d 602, 106 S.Ct. 1375].)[8]

In *Carroll* v. *Blinken, supra,* 957 F.2d 991 (*Carroll*), students at the State University of New York (SUNY) at Albany challenged the use of a portion of their mandatory student activity fee to fund the New York Public Interest Research Group, Inc. (NYPIRG). NYPIRG, a statewide organization with chapters on 19 SUNY campuses, described itself as a " 'nonpartisan research and advocacy organization directed by New York State college and university students.' " (*Id.,* at pp. 993-994.) NYPIRG spent money both on and off campus. On campus, NYPIRG financed research projects by students and sponsored debates, symposiums, and professors' fora on issues of public interest. Off campus, NYPIRG employed 60 full-time professional staff members to lobby the state government on issues of " 'consumer protection, government and corporate accountability and economic and social justice.' " (*Id.,* at p. 994.)

The court in *Carroll* identified the limits of mandatory funding by balancing the educational benefits that NYPIRG offered to students against the infringement of the dissenting students' right not to be compelled to subsidize NYPIRG's political activities. The court frankly recognized the infringement. To quote the opinion, the dissenting students' "right to be free from compelled speech suffers when NYPIRG uses student funds to raise issues on campus, organize the community and lobby the legislature in pursuit of 'economic and social justice.' " (957 F.2d at p. 999.) The court also recognized that these intrusions must be " 'narrowly drawn to avoid unnecessary intrusion on freedom of expression' " and justified by the state.

---

[8]Decisions upholding the use of mandatory fees to create public fora, such as student newspapers and speakers' bureaus, offer little assistance in resolving this case. (E.g., *Kania* v. *Fordham* (4th Cir. 1983) 702 F.2d 475; *Arrington* v. *Taylor* (M.D.N.C. 1974) 380 F.Supp. 1348; *Veed* v. *Schwartzkopf* (D.Neb. 1973) 353 F.Supp. 149.) No one argues that any of the student groups involved in the case before us is a public forum. To the contrary, the record clearly demonstrates that each is expressly devoted to advancing its own political and ideological causes.

Other decisions cited by the dissent to show that students may be compelled to fund political and ideological causes (*Lace* v. *University of Vermont* (1973) 131 Vt. 170 [303 A.2d 475]; *Good* v. *Associated Students of Univ. of Washington* (1975) 86 Wn.2d 94 [542 P.2d 762]) do little to support that position. The court in *Good* held that a student association receiving mandatory fees could *not* "become a vehicle for the promotion of one particular viewpoint, political, social, economic or religious," and remanded for evidentiary proceedings to determine whether the university had failed to enforce its own guidelines on the use of funds. (*Good, supra,* 542 P.2d at pp. 769-770.) The *Lace* court rejected a challenge to mandatory fees, but only because the record did not show that the student plaintiffs had "either pled or proved that they were required through the assessment of the mandatory student activities fee to finance the promotion of religious, political, or philosophical causes." (*Lace, supra,* 303 A.2d at p. 479.)

(*Ibid.*, quoting *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 69 fn. 7 [68 L.Ed.2d 671, 681, 101 S.Ct. 2176].) However, the court found that NYPIRG offered benefits on campus that were "substantial enough to justify the infringement . . . ." (*Carroll*, *supra*, 957 F.2d at p. 1001.) These benefits consisted of promoting extracurricular life, transmitting skills and civic duty, and stimulating energetic campus debate. (*Ibid.*)

The *Carroll* court reached a different conclusion regarding NYPIRG's off-campus activities. Reasoning, as before, that "even incidental burdens on speech [must] be 'narrowly drawn' " (957 F.2d at p. 1002, quoting *Schad* v. *Mt. Ephraim*, *supra*, 452 U.S. at p. 69, fn. 7 [68 L.Ed.2d at p. 681]; cf. *Carroll*, *supra*, at p. 999), the court concluded that the purported educational benefits "vanish when NYPIRG money is spent in the halls of the state legislature . . . ." (*Id.*, at p. 1002.) The university's interests, the court reasoned, "are still, after all, those of the university and its community, not that of an independent statewide organization." (*Ibid.*)

There is language in *Carroll* that the Regents interpret as suggesting that the standard of review in cases such as this is more relaxed than the strict scrutiny standard that courts typically apply in cases involving burdens on speech and associational rights. However, we do not read the Second Circuit's opinion that way. The court wrote, citing *United States* v. *Albertini* (1985) 472 U.S. 675 [86 L.Ed.2d 536, 105 S.Ct. 2897] (*Albertini*), that it would "look to see whether the [challenged] regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " (*Carroll*, *supra*, 957 F.2d at p. 999, quoting *Albertini*, *supra*, 472 U.S. at p. 689 [86 L.Ed.2d at p. 548].) In context, however, it is clear that the high court in *Albertini* did not use this language to announce a relaxed standard of review. In that case the Court upheld, as applied to a person protesting nuclear weapons, a law making it a criminal offense to reenter a military base after having been ordered not to do so by the commander. The high court did use the language quoted in *Carroll*, but the Court also emphasized that even "an incidental burden on speech [must be] no greater than is essential . . . ." (*Albertini*, *supra*, 472 U.S. at p. 689 [86 L.Ed.2d at p. 548].) Reading the quoted language in context, it is evident that the high court merely applied a version of the strict scrutiny test that courts traditionally apply in symbolic conduct cases.[9]

Whatever the import of the *Carroll* court's reference to *Albertini* may be, what matters for our purposes is this: The Second Circuit expressly and

---

[9]"[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." (*Albertini*, *supra*, 472 U.S. at p. 689 [86 L.Ed.2d at p. 548].)

In *United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673], to which the *Albertini* opinion refers, the high court applied strict scrutiny to a symbolic conduct case.

repeatedly recognized that the defendants had to show that SUNY's mandatory funding rule was " 'narrowly drawn to avoid unnecessary intrusion' " on constitutional rights. (*Carroll, supra*, 957 F.2d at pp. 999, 1002, quoting *Schad* v. *Mt. Ephraim, supra*, 452 U.S. at p. 69, fn. 7 [68 L.Ed.2d at p. 681].) This, in essence, is strict scrutiny, the same standard that the high court invoked in *Hudson* (*supra*, 475 U.S. at p. 303, fn. 11 [89 L.Ed.2d at p. 245]).

In *Galda* v. *Rutgers, supra*, 772 F.2d 1060 (*Galda*), the court applied the same test to a similar organization but reached a different conclusion. The student plaintiffs at Rutgers, the State University of New Jersey, objected to the use of a mandatory fee to support the New Jersey Public Interest Research Group (New Jersey PIRG). New Jersey PIRG, like the organization involved in *Carroll, supra*, 957 F.2d 991, was a statewide organization with student members on many campuses. New Jersey PIRG lobbied the federal and state governments on various matters of social interest, including the proposed Equal Rights Amendment, nuclear weapons, and the environment. New Jersey PIRG also provided internships for students, who received academic credit on campus for the work they performed. (772 F.2d at p. 1061.)

The court in *Galda* considered it important that New Jersey PIRG was a statewide organization rather than one consisting solely of Rutgers students. The court also attributed significance to the particular funding mechanism employed: Students voted periodically to support New Jersey PIRG through a separate, mandatory fee rather than through the general student activities fund. For these reasons, the court felt that it was unnecessary to "address the problem presented by a state university's allocation of a mandatory non-refundable student activity fee" or the question whether "an organization with PIRG's philosophic outlook may be funded though the general activities fund as are other campus organizations representing diverse views." (772 F.2d at p. 1064.)

The particular facts of the *Galda* case undoubtedly determined its outcome, but there is nothing in the Third Circuit's approach that prevents its application to on-campus student groups. In essence, the court inquired whether mandatory funding of New Jersey PIRG was necessary to achieve the university's educational goals and weighed the purported educational benefits against the burden on constitutional rights to determine whether the

"Application of a facially neutral regulation that incidentally burdens speech satisfies the First Amendment if it 'furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " (*Albertini, supra*, 472 U.S. at pp. 687-688 [86 L.Ed.2d at p. 547], quoting *United States* v. *O'Brien, supra*, 391 U.S. at p. 377 [20 L.Ed.2d at p. 680].)

burden was justified. (*Galda, supra,* 772 F.2d at pp. 1065-1068.) This, of course, is the same approach that the Second Circuit took in *Carroll* (*supra,* 957 F.2d at pp. 1001-1002).

Following this approach, the *Galda* court accepted the university's argument that participation in New Jersey PIRG offered educational benefits to students. However, the court determined that the educational benefits offered by New Jersey PIRG were not sufficient to justify the infringement of dissenting students' speech and associational rights. The court reasoned as follows: "Although the training PIRG members may receive is considerable, there can be no doubt that it is secondary to PIRG's stated objectives of a frankly ideological bent. To that extent the educational benefits are only 'incidental'—arising from or accompanying the principal objectives—and subordinate to the group's function of promoting its political and ideological aims." (772 F.2d at p. 1065.)

While there is language in *Galda* suggesting that the mandatory funding of political groups might be acceptable if accomplished through a content-neutral process in which all groups on campus were free to compete (772 F.2d at p. 1067), the opinion did not purport to announce such a holding. Moreover, other language in the opinion cogently demonstrates why a content-neutral funding process, standing alone, cannot sufficiently protect the rights of students who do not wish to subsidize other students' political activity.[10] To quote the *Galda* opinion, "even if the opponents succeed in achieving mandatory contributions for their own organization, they are not relieved from the obligation to pay a fee to a group with which they disagree. For example, if the university compelled a student to make separate contributions to both the Democratic and Republican National Committees, the evil is not undone; it is compounded. Adherents to each party would be forced to pay a fee to the other political group, a clearly unconstitutional exaction." (*Ibid.*) The Second Circuit made the same point in *Carroll, supra*: "The fact that appellants' student activity fee will also compel them to speak through a number of other campus groups in addition to NYPIRG in no way heals the constitutional infirmity; it simply means that students must fund more than one unwanted view." (957 F.2d at p. 998, citing *Galda, supra,* 772 F.2d at p. 1067.)

---

[10]*Widmar v. Vincent* (1981) 454 U.S. 263 [70 L.Ed.2d 440, 102 S.Ct. 269], which the Regents and the ASUC cite, does not compel a contrary conclusion. There, the high court held that a state university that made its facilities generally available for the activities of student groups could not close its facilities to one group because of its religious nature. But the high court did not hold that the university was required to create a forum generally open to student groups, let alone a particular type of forum. And the high court's opinion, while mentioning that the groups in question were funded by a student activities fee (*id.,* at p. 265 [70 L.Ed.2d at p. 444]), said nothing about the propriety of such funding or the problem of compelled speech.

The principles that we derive from *Carroll* and *Galda*, as well as *Keller* and *Abood*, are these: A university may, in general, support student groups through mandatory contributions because that use of funds can be germane to the university's educational mission. (*Carroll, supra*, 957 F.2d at pp. 1001-1002; cf. *Keller, supra*, 496 U.S. at pp. 13-14 [110 L.Ed.2d at pp. 13-14], and *Abood, supra*, 431 U.S. at pp. 232-237 [52 L.Ed.2d at pp. 282-286].) At some point, however, the educational benefits that a group offers become incidental to the group's primary function of advancing its own political and ideological interests. (*Galda, supra*, 772 F.2d at pp. 1065, 1068; cf. *Carroll, supra*, 957 F.2d at p. 1002.) To fund such a group may still provide some educational benefits, but the incidental benefit to education will not usually justify the burden on the dissenting students' constitutional rights. Phrased in terms of the tests that courts have applied, a regulation that permits the mandatory funding of such groups is not " 'narrowly drawn to avoid unnecessary intrusion on freedom of expression' " (*Carroll, supra*, 957 F.2d at p. 999, quoting *Schad* v. *Mount Ephraim, supra*, 452 U.S. at p. 69, fn. 7 [68 L.Ed.2d at p. 681]; see also *Carroll, supra*, 957 F.2d at p. 1002), and it "unnecessarily restrict[s] constitutionally protected liberty, [when] there is open a less drastic way of satisfying its legitimate interest" (*Galda* v. *Rutgers, supra*, 772 F.2d at p. 1066).

One can reach the same result by applying the *Carroll* court's alternative formulation of the test. When mandatory funding is being used to create an incidental benefit to education at the cost of a significant burden on constitutional rights, it cannot usually be said that the state is " 'promot[ing] a substantial government interest that would be achieved less effectively absent the regulation.' " (*Carroll, supra*, 957 F.2d at p. 999, quoting *Albertini, supra*, 472 U.S. at p. 689 [86 L.Ed.2d at p. 548].)

We find no reason to doubt that the burden on dissenting students' speech and associational rights in this case is real and substantial. Students are, in fact, forced to support causes they strongly oppose. For example, students who favor abortion rights must pay to support the political activities of Berkeley Right to Life, a group opposed to abortion, and students opposed to abortion must subsidize groups such as Campus N.O.W. and Campus Abortion Rights Action League, which favor abortion rights. Another possible consequence of the current funding system was suggested at oral argument. Counsel for the ASUC acknowledged that a group which espoused the supremacy of a particular race would be eligible to receive mandatory fees so long as it permitted all students to join without discrimination. A sufficient remedy for the "incidental infringement" of the rights of a student of a different race, counsel suggested, would be to "join that group and engage in vigorous debate within that group as to whether their ideas are acceptable or

not." One might ask, rhetorically, whether being compelled to subsidize an organization whose goals one abhors is less of a burden than being compelled to display the state motto on a license plate (*Wooley* v. *Maynard* (1977) 430 U.S. 705, 714-717 [51 L.Ed.2d 752, 762-764, 97 S.Ct. 1428] ["Live Free or Die"]), a burden that the high court has found to be impermissible.

■ The ASUC does purport to have a standard for identifying those groups whose political activities are of such a nature as to disqualify them from receiving support from mandatory fees. Specifically, an ASUC rule requires that funds not be used for "partisan political activities or any ballot measure . . . ." (ASUC, Policy & Procedure Manual, Guidelines for Funding Student Organizations, pp. 9-10.) However, the rule does not satisfy constitutional requirements, either on its face or as applied. While the rule on its face bars funding only for "partisan political" activities, much broader concerns are at stake. The court's opinion in *Abood, supra,* 431 U.S. 209, makes this clear: "It is no doubt true that a central purpose of the First Amendment ' "was to protect the free discussion of governmental affairs." ' [Citations.] But our cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection. Union members in both the public and private sectors may find that a variety of union activities conflict with their beliefs. [Citations.] Nothing in the First Amendment or our cases discussing its meaning makes the question whether the adjective 'political' can properly be attached to those beliefs the critical constitutional inquiry." (*Id.,* at pp. 231-232 [52 L.Ed.2d at pp. 281-282], fn. omitted.)

Moreover, as applied by the ASUC, the "partisan political" rule actually *permits* the use of mandatory fees to fund a great deal of activity that is indisputably political and even "partisan" by any reasonable definition.[11] Indeed, the ASUC's executive vice-president testified at trial that the rule has been interpreted to bar funding only for the campus Young Republicans and Young Democrats. In contrast, the rule has been interpreted not to bar funding for "a group that supports the nuclear freeze initiative," "organizations that support the [proposed Equal Rights Amendment]," "organizations that hold demonstrations against the policies of the Reagan administration," "organizations that oppose U.S. aid to the government of El Salvador," "[o]rganizations that oppose construction of the peripheral canal," "[o]rganizations that support gay rights legislation," "a group that advocates replacement of our current form of government with a revolutionary socialist

---

[11]A "partisan" is generally defined as "one that takes the part of another: an adherent to a party, faction, cause, or person . . . ." (Webster's Third New Internat. Dict. (1982) p. 1647.)

regime," and "a group that supports abolition of the death penalty." Confronted with these funding decisions on cross-examination, the ASUC witness conceded that she could not articulate the criteria by which the ASUC determined whether a group was "partisan" or "nonpartisan."

If these examples left any doubt that the ASUC's "partisan political" rule lacked any meaningful content, to be convinced of the point one would only need to consider the ASUC's decision to fund the Young Spartacus League. This group, according to the record, supported the former Soviet Union's invasion of Afghanistan, opposed the Solidarity movement in Poland, and, to quote its successful application for ASUC funding, "seeks to build a revolutionary socialist movement which can intervene in all social struggles armed with a working class program based on the politics of Marx, Lenin and Trotsky, as part of a disciplined revolutionary movement." We do not in any way mean to suggest that this group, or any group, should not be permitted to register with the University and attempt by all legitimate means to persuade other students of the correctness of its views. However, to fund the Young Spartacus League as "nonpartisan," while denying funding to the Young Republicans and Young Democrats as "partisan," borders on the absurd.

We need not determine in the first instance whether each of the groups that plaintiffs specifically challenged at trial do or do not offer educational benefits that justify the infringement of plaintiffs' speech and associational rights. However, if the Regents decide to implement educational programs that entail burdens on constitutional rights they must ensure that the burdens are justified, and it is clear that they have made no serious effort to do so. At oral argument, counsel for the Regents argued that such a determination is virtually impossible to make because the terms "political" and "ideological" are vague. However, the high court has required labor unions and a state bar association to identify "political" and "ideological" activities that cannot properly be charged to mandatory contributors. (*Keller, supra,* 496 U.S. at p. 15 [110 L.Ed.2d at p. 15]; *Abood, supra,* 431 U.S. at pp. 235-236 [52 L.Ed.2d at pp. 284-285].) As already discussed, the Regents have more discretion than the defendants in *Keller* and *Abood* in determining how to use mandatory fees because some student political activity is germane to the University's educational mission. However, when a group's educational function has become merely incidental to its political and ideological activities, then the infringement of dissenting students' constitutional rights can no longer be justified by the purported educational benefit. (*Galda, supra,* 772 F.2d at pp. 1065, 1067-1068.)

So long as the present system of funding student activity groups continues, the only practical way to protect the rights of dissenting students is to

implement the procedures outlined in *Hudson, supra,* 475 U.S. 292, 301-310 [89 L.Ed.2d at pp. 243-249], and *Keller, supra,* 496 U.S. 1, 16-17 [110 L.Ed.2d at pp. 15-16]. These procedures will require the Regents to identify any groups that are ineligible for mandatory funding under the constitutional standards set out above and offer students the option of deducting a corresponding amount from the mandatory fee. The State Bar of California adopted a similar procedure to comply with the high court's decision in *Keller, supra.* Students who disagree with the Regents' calculation of the deduction will be entitled to the procedural safeguards articulated in *Keller:* "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker, and an escrow for the amounts reasonably in dispute while such challenges are pending." (496 U.S. at p. 16 [110 L.Ed.2d at p. 16], internal quotation marks omitted.)

While these procedures will obviously entail some administrative burden, they will not necessarily require the Regents to review each of the University's 150 registered student groups. Of these groups, the vast majority appear to have no discernible political or ideological interests; plaintiffs have challenged only 14. Moreover, as the high court has observed, even if such a procedure did " 'result in some . . . administrative burden . . . and perhaps prove at times to be somewhat inconvenient, such additional burden or inconvenience is hardly sufficient to justify contravention of the constitutional mandate. It is noteworthy that unions representing government employees have developed, and have operated successfully within the parameters of *Abood* procedures for over a decade.' " (*Keller, supra,* 496 U.S. at pp. 16-17 [110 L.Ed.2d at p. 16], quoting *Keller* v. *State Bar* (1989) 47 Cal.3d 1152, 1192 [255 Cal.Rptr. 542, 767 P.2d 1020] (conc. and dis. opn. of Kaufman, J.).)

Of course, the Regents must provide a refund only to those students who object to the use of their fees for political and ideological activities. There is no legal barrier to funding such activities with the fees of students who do not object. Moreover, the refund will be necessary only so long as the Regents continue to subsidize political and ideological activities through mandatory fees. The Regents are free to adopt another system of funding student activities, such as a voluntary system, that avoids the constitutional defects identified in this opinion.

C. *ASUC-funded Lobbying.*

Plaintiffs have also challenged the ASUC's use of mandatory fees to lobby the state and municipal governments. Issues on which the ASUC has

lobbied in the past include a nuclear freeze initiative, public transportation fares, city investment policy, zoning, rent control, rent discrimination, the use of registration fees to fund abortions, budget cuts for the University, and mandatory student fees.

The Court of Appeal disposed of plaintiffs' claim summarily, observing that "the record supports the trial court's finding that lobbying activities are confined to student and university issues." Applying the test of germaneness articulated in *Keller* (*supra*, 496 U.S. at pp. 13-14 [110 L.Ed.2d at pp. 13-14]) and *Abood* (*supra*, 431 U.S. at pp. 217-223, 232-237 [52 L.Ed.2d at pp. 272-277, 282-286]), the court concluded that "no constitutional infringement occurred" because the ASUC's lobbying activities "are related to the university's function."

The Court of Appeal's reasoning entails two serious flaws. First, the trial court did not make the finding on which the Court of Appeal purported to rely. Rather than finding that the ASUC's lobbying efforts had been confined to student- and university-related issues, the trial court in its statement of decision merely cited a University policy permitting the ASUC to lobby on such issues. In fact, there is undisputed evidence in the record that the ASUC has lobbied on issues that have no meaningful relationship to students as students or to the University, such as a nuclear freeze initiative and municipal investment policy.

Second, even if the ASUC's lobbying had been limited to student- and university-related issues, it does not follow that there is no constitutional problem. The Court of Appeal's reasoning assumes that one of the ASUC's purposes is to represent student interests before the municipal and state governments and that lobbying on university-related issues is germane to that purpose under *Keller* (*supra*, 496 U.S. 1) and *Abood* (*supra*, 431 U.S. at 209.) However, plaintiffs' meritorious objections to this reasoning find no answer in the Court of Appeal's opinion.

Plaintiffs object, initially, that the analogy to collective bargaining is not truly apposite in this context. While the Regents have authorized the ASUC to communicate with government officials on public issues (University of Cal., Policies Applying to Campus Activities, Organizations, and Students, pt. A (rev. July 21, 1978) § 63.00, at p. 18),[12] the Regents have not purported to authorize the ASUC to negotiate with the government, or any other body,

---

[12]"Student governments shall have the right to address and take positions on public issues. Positions on issues taken by student governments shall not be represented as or deemed to be official positions of the University. Compulsory student fees shall not be expended in support of such positions except for University-related purposes. Any communications by student

on students' behalf. Indeed, the relevant statement of policy negates any such implication by cautioning that the ASUC's permission to lobby "does not affect the right of any student, as an individual, to petition government officials or bodies." (*Ibid.*) Furthermore, it is not clear that the state has any reason at all, let alone a compelling reason, to appoint a "bargaining representative" for students in their dealings with the government.

Plaintiffs also argue that, even if the Regents had appointed the ASUC to represent student interests before government bodies, it does not follow that the permissible scope of lobbying would include all student- and university-related matters. A public employees' union, in comparison, may not use mandatory contributions to support lobbying on all union-related matters. This was the holding of *Lehnert* v. *Ferris Faculty Assn.* (1991) 500 U.S. ___ 114 L.Ed.2d 572, 111 S.Ct. 1950] (*Lehnert*). In that case, the high court held that "the State constitutionally may not compel its employees to subsidize legislative lobbying or other political union activities *outside the limited context of contract ratification or implementation.*" (*Id.*, at p. ___ [114 L.Ed.2d at p. 591], italics added.) Thus, while the plaintiffs in *Lehnert*, who were state college professors, could be compelled to subsidize a union's collective bargaining efforts, they could not be compelled to subsidize lobbying on matters other than collective bargaining, even matters as closely related to the union's interests as taxes for the support of public education. (*Id.*, at p. ___ [114 L.Ed.2d at p. 594].)

The high court's reasoning in *Lehnert* bears repeating because it appears to apply with equal force to the ASUC's lobbying efforts: "[A]llowing the use of dissenters' assessments for political activities outside the scope of the collective-bargaining context would present 'additional interference with the First Amendment interests of objecting employees.' [Citation.] There is no question as to the expressive and ideological content of these activities. Further, unlike discussion by negotiators regarding the terms and conditions of employment, lobbying and electoral speech is likely to concern topics about which individuals hold strong personal views. Although First Amendment protection is in no way limited to controversial topics or emotionally charged issues [citations], the extent of one's disagreement with the subject of compulsory speech is relevant to the degree of impingement upon free expression that compulsion will effect.

"The burden upon freedom of expression is particularly great where, as here, the compelled speech is in a public context. By utilizing petitioners'

governments or units thereof to Federal, State, or local government officials or bodies on such issues must avoid any implication that the positions taken are sponsored, endorsed, or favored by the University. This does not affect the right of any student, as an individual, to petition governmental officials or bodies."

funds for political lobbying and to garner the support of the public for its endeavors, the union would use each dissenter as 'an instrument for fostering public adherence to an ideological point of view he finds unacceptable.' [Citation.] The First Amendment protects the individual's right of participation in these spheres from precisely this type of invasion. Where the subject of compelled speech is the discussion of governmental affairs, which is at the core of our First Amendment freedoms [citations], the burden upon dissenters' rights extends far beyond the acceptance of the agency shop and is constitutionally impermissible." (*Lehnert, supra,* 500 U.S. at p. __ [114 L.Ed.2d at p. 591].)

Thus, under *Lehnert,* even if the state has a sufficiently compelling interest to require unwilling persons to support an organization financially, the state may not compel support for lobbying efforts except on those matters that are strictly necessary to further the interest that justified the requirement of support. Applying this principle to the case before us compels us to reverse the judgment. Even if the Regents had appointed the ASUC to negotiate with governmental bodies on students' behalf, and even if the state had a compelling reason to do so, under *Lehnert* the state still could not force unwilling students to subsidize lobbying beyond the narrow subject matter that justified the requirement of support. However, the Regents have not claimed any interest in requiring students to support the ASUC's lobbying except the interest in providing an educational opportunity. In view of the "core" political freedoms that are at stake (see *Lehnert, supra,* 500 U.S. at p. __ [114 L.Ed.2d at p. 591]), the educational benefit to a few student lobbyists cannot justify the burden on all students' free speech and associational rights.

For these reasons, we hold that the Regents may not collect, from any student who objects, that portion of the mandatory fee that represents the cost of lobbying governmental bodies. Students who disagree with the Regents' calculation of the corresponding deduction will be entitled to the procedural safeguards set out above. (See *Hudson, supra,* 475 U.S. 292, 301-310 [89 L.Ed.2d at pp. 243-249]; *Keller, supra,* 496 U.S. 1, 16-17 [110 L.Ed.22d at pp. 15-16].)

D. *The ASUC Senate's Political Activities.*

For many years, the ASUC Senate has debated, adopted, and publicized resolutions on current political issues. Issues that have received the ASUC Senate's attention include, for example, gay and lesbian rights, the proposed Equal Rights Amendment, gun control, draft registration, boycotts of businesses involved in labor disputes, the reelection of a United States Representative, a municipal initiative to legalize marijuana, and the treatment of

political prisoners in foreign countries. The ASUC Senate also supports voter registration, draft counselling, and renters' assistance programs. Plaintiffs introduced evidence at trial to show that these programs had occasionally become channels for political activity.

■ Plaintiffs contend that the state may not compel them to finance these political activities through mandatory fees. In opposition, the Regents assert that no income from mandatory contributions has been used to support such activities. The trial court did not specifically address this issue in its statement of decision. The Court of Appeal upheld the ASUC Senate's political activities, but it did not rely on the Regents' theory that no mandatory fees have been used to subsidize them. Instead, avoiding the unresolved factual issue, the court purported to uphold the ASUC Senate's political activities as a matter of law. The court reasoned that such activities "contribute[] to the educational mission of the university" and that, if plaintiffs did not approve of positions taken by the ASUC Senate, "there is nothing to prevent plaintiffs from seeking senate office and making their own voices heard in the senate debates."

The Court of Appeal's resolution of this issue cannot withstand scrutiny. To be sure, the ASUC Senate's practice of taking and publicizing positions on political issues may have educational value for those few students who are involved. However, as already discussed, if mandatory fees are used for this purpose there is a burden on dissenting students' speech and associational rights. The Court of Appeal's analysis is incomplete because it made no effort to determine whether the purported educational benefits justify the burden. Indeed, the court betrayed a certain indifference to plaintiffs' constitutional claims in suggesting that the remedy for compelled speech lies in more compelled speech, i.e., suggesting that plaintiffs "seek[] senate office and mak[e] their own voices heard in the senate debates."

Of course, there would be no need to address plaintiffs' claim if it were true, as the Regents assert, that no income from mandatory fees has been used to support the ASUC Senate's political activities. However, the Regents' position seems to contradict the trial court's finding that mandatory fees were used for "operation expenditures for the ASUC Senate." The Regents' position also seems to contradict the ASUC's response to plaintiffs' interrogatories. In their interrogatories, plaintiffs asked the ASUC to "[s]tate what steps ASUC has taken to publicize resolutions adopted by the ASUC Senate." The ASUC answered that it had "placed ads in the Daily Cal [a student newspaper]; distributed posters, leaflets and flyers; published ASUC information books; sent out press releases to major media; sponsored on-campus discussion groups, workshops and rallies; [and] placed notices on

campus bulletin boards and kiosks . . . ." These forms of publicity usually entail costs, if only for paper and ink.

The Regents' assertion that mandatory fees have not been used to subsidize the ASUC's political activities could also mean that the ASUC segregates mandatory fees from other sources of income and uses the former only for nonpolitical purposes. The earmarking of funds, however, would not necessarily eliminate the constitutional problem. In *Abood* (*supra*, 431 U.S. 209, 237, fn. 35 [52 L.Ed.2d p. 285]), the high court rejected earmarking as a remedy for constitutional violations caused by the use of mandatory fees for political purposes. Because earmarking leaves the same total amount of funds at the organization's disposal and permits the organization to spend the same amount on political activities, earmarking " 'is of bookkeeping significance only rather than a matter of real substance.' " (*Ibid.*, quoting *Retail Clerks* v. *Schermerhorn* (1963) 373 U.S. 746, 753 [10 L.Ed.2d 678, 683, 83 S.Ct. 1461 ].) For these reasons, the Court has held in the agency-shop context that "it is plainly not an adequate remedy to limit the use of the actual dollars collected from dissenting employees to collective-bargaining [i.e., non-political and non-ideological] purposes . . . ." (*Abood, supra*, 431 U.S. at p. 237, fn. 35 [52 L.Ed.2d at p. 285].)

In view of the foregoing discussion, it is evident that the lower courts have not yet adequately addressed the factual and legal issues raised by the ASUC Senate's own political activities. If further evidentiary proceedings show that mandatory fees have been spent on political activities by the ASUC Senate, then the Regents shall have the burden of demonstrating that the resulting burden on dissenting students' speech and associational rights is germane to, and justified by, such activities' educational value in accordance with the principles discussed above. If the Regents do not satisfy that burden, then plaintiffs will be entitled to relief under the procedures set out in *Keller, supra*, 496 U.S. 1, 16-17 [110 L.Ed.2d 1 at pp. 15-16], and *Hudson, supra*, 475 U.S. 292, 301-310 [89 L.Ed.2d 232 at pp. 243-249]. We shall remand these issues for further proceedings in accordance with the views expressed herein.

In view of our determination that plaintiffs are entitled to relief on their claims regarding student groups and ASUC lobbying, and that further proceedings must take place on plaintiffs' claims regarding the ASUC Senate's political activities, there is no need at this stage of the proceeding to address plaintiffs' alternative claims to the same relief under article IX, section 9 of the state Constitution, section 13 of the Organic Act (Stats. 1867-1868, ch. CCXLIV, § 13, p. 254)), *Stanson* v. *Mott, supra*, 17 Cal.3d 206, and the federal Constitution's establishment clause (U.S. Const., Amend. I).

### III. Disposition

The judgment of the Court of Appeal is affirmed insofar as it holds that the Regents of the University have power to impose and collect a mandatory student activities fee. In all other respects the judgment is reversed. The case is remanded to the Court of Appeal, which shall direct the superior court to conduct further proceedings, and to grant relief, in accordance with this opinion.

Lucas, C. J., Kennard, J., Baxter, J., and George, J., concurred.

**ARABIAN, J.,** Dissenting.—Today's decision does a disservice to the people of the State of California, and to the high principles that this court is sworn to uphold.

I do not disagree with my colleagues lightly or often. However, in holding that the University of California at Berkeley (University) violates the United States Constitution by promoting the dissemination of controversial *ideas*, the court itself violates that fundamental charter of freedom. In premising this holding on a spurious and ill-defined distinction between "educationally beneficial" and "ideological" speech, the majority abdicate their primary duty of reasoned adjudication, and condemn the University and the lower courts to additional and futile litigation. In disdaining *unanimous* state and federal case law to the contrary, they underscore their isolation from mainstream jurisprudence. In purporting to reach this unfortunate result under compulsion of United States Supreme Court precedent, they fundamentally misread the high court's landmark decisions, and contravene the spirit of their holdings.

Accordingly, I must dissent. Contrary to the majority, I would hold that the funding of student groups engaged in on-campus speech—regardless of political or ideological content—is germane to the University's educational mission and serves compelling national interests. As long as the funds are distributed in a neutral fashion and are not used to promote partisan political purposes, to finance off-campus activities or to interfere with the free speech rights of others, such funding is well encompassed within the constitutional mandate of the University.

### Introduction

Let us be clear about what is at issue here. The dispute centers on the University's considered educational judgment that student groups who distribute leaflets, show films, sponsor speakers and organize discussion forums

on the University campus, help contribute to the mission of the University and therefore may be reimbursed for certain limited expenses from the fund generated by the mandatory student fee. The majority *reject* the University's judgment. They believe, rather, that because some students disagree with the "political" views expressed by certain groups, the First Amendment rights of the dissenting students must take precedence. They hold that where the "educational benefit" of such speech is merely "incidental" to its "political" or "ideological" message, it may not constitutionally be funded from the mandatory fee.

To those who honor the Constitution, respect academic freedom, and strive to uphold the integrity and rationality of the courts, the majority decision will be greeted as a jurisprudential debacle. It fails completely—in fact it makes virtually *no* effort—to explain, much less support, its holding that speech with an "ideological" or "political" message is *any* less educationally beneficial than speech which lacks such political content. Indeed, the majority betray a shocking ignorance of the University's educational mission and the vital state interest that it serves—the regeneration of those fundamental republican virtues upon which this nation was founded, and upon which its continued commitment to civil liberty depends. I am referring, of course, to the power and determination of its citizens to form and express their own opinions, to critically evaluate the opinions of others, and, most importantly, to *tolerate* the opinions of those with whom they most *disagree*.

The funding of on-campus activities groups engaged in a broad variety of speech—controversial, political, ideological, social, cultural—no matter how annoying or disagreeable to some, plays an integral role in the University's mission. Indeed, such speech is inherently educational. It is not the "price" students pay for a university education, it is the very essence of that education.

The majority's ill-conceived dichotomy between "political" and "educationally beneficial" speech does more, however, than simply misunderstand the nature of the University and its critical role in our political culture. The majority provide virtually *no* guidance to the parties and the lower courts to distinguish between "political" and "educationally beneficial" speech. The record contains literally dozens of leaflets, pamphlets and broadsides posted and distributed on campus by the student groups that plaintiffs oppose. Which of these lacks sufficient "educational" content to be eligible for reimbursement of printing costs? The leaflet distributed by Women Organized Against Sexual Harassment inviting students to a workshop to "talk about our experiences. . . . [and] to provide legal, emotional and political

support?" The leaflet distributed by the Berkeley Feminist Alliance announcing a documentary film "against militarism, poverty, and oppression" and sponsoring a speaker from El Salvador "speaking on women's involvement in the struggle there?" A broadside sponsored by the Education & Action Project announcing a rally of "speakers and music" to protest the President's environmental and social policies? The majority provide no guidance to the lower courts and the Regents to judge the "educational benefit" of these pamphlets; it is virtually anyone's guess.

The majority's reluctance to provide specific standards or illustrations is easy to understand. The dichotomy between "educationally beneficial" and "ideological" speech is a false and pernicious one. It purports to judge the educational *value* of speech on the extent of its political message or ideological viewpoint. Such an enterprise is fraught with peril, to the academic freedom of the University, and to the right of all Americans to think and speak freely.

Perhaps this is why the majority, having created such a troubling doctrine, are unable to apply it. Instead, in "deference" to the University's academic judgment, the majority remand the matter to the Regents to separate the "educationally beneficial" groups from the excessively "political" or "ideological," and to adopt a funding mechanism reflecting these decisions. Confronted with the court's holding, the Regents' practical options are limited, and none of them is appealing: (1) Abolish the mandatory fee altogether on every University campus (not a likely scenario, in light of the Regents' demonstrated commitment to the funding of student speech); (2) attempt to comply with the court's holding, which will unleash a firestorm of protest and lawsuits by those groups deemed (by whatever arbitrary standards the University might devise) too "political" to warrant funding; or (3) maintain their current position that all of the University's registered groups are "educationally beneficial," a conclusion clearly in defiance of the majority's implication that certain groups, such as the Young Spartacus League (which according to its charter "seeks to build a revolutionary socialist movement . . . .") fall in the noneducational category. This will undoubtedly trigger a new lawsuit by plaintiffs to enforce the "principles" set forth in the majority opinion. The court's opinion, in short, will only generate further litigation in a vain attempt to decipher its cryptic and misguided holding.

The crux of the constitutional issue is cogently presented here; the dispositive determination has been made; a remand advances the issue not a step further. The majority's holding that the University is constitutionally forbidden to fund student speech whose "educational benefit" is only incidental to

its "ideological" viewpoint represents such a radical departure from educational reality and settled law (as will appear, all of the case law is to the contrary) that I urge the University to petition the United States Supreme Court for certiorari, and that high court to grant review.

## Discussion

### A. *Summary*

The precise question presented is whether the First Amendment to the United States Constitution compels the dismantling of a system of mandatory student fees utilized by the University and other University of California campuses throughout the state to finance student government and activities groups. Plaintiffs, Berkeley students who disagree with the views expressed by many of the groups receiving such funds, contend that the mandatory fee constitutes a species of compelled speech prohibited by the First Amendment as interpreted by the United States Supreme Court in such cases as *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782] (*Abood*) and *Keller* v. *State Bar of California* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228] (*Keller*).[1]

The question plaintiffs raise is an important one. As Justice Jackson eloquently observed, our Constitution permits "no official, high or petty, [to] prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 642 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674]; accord, *Keller, supra,* 496 U.S. at p. 10 [110 L.Ed.2d at pp. 11-12]; *Abood, supra,* 431 U.S. at p. 235 [52 L.Ed.2d at pp. 284-285].) Indeed, the University's educational mission is precisely to combat orthodoxy by encouraging the dissemination of a multiplicity of views and interests, many of which will inevitably provoke controversy, debate and opposition. The collection and disbursement of the mandatory fee play an integral part in the University's educational function, by providing students with the modest financial assistance necessary to engage in student government and parliamentary debate, to organize around common interests, and to advocate and argue ideas in the spirited intellectual atmosphere of the university campus.

---

[1] It is important to state clearly that the issue here turns on the First Amendment to the United States Constitution and *not* its state equivalent, article I, section 2, subdivision (a) of the California Constitution. The majority note that plaintiffs raised the state provision in their complaint, but give no indication that plaintiffs failed to discuss the state provision in their Court of Appeal briefs, failed to raise the state provision in their petitions for review, and failed to cite, argue or discuss the state provision in their subsequent briefs on the merits. Thus, the state provision was not preserved for review on appeal, and therefore forms no independent basis of the court's decision.

Thus, while we look to the Supreme Court's decisions for guidance, the fact remains that we are confronted with an institution whose scope and purposes are altogether different from the labor union in *Abood* or the state bar in *Keller*. The latter constitute highly specialized vocational groups, organized around the narrow interests of a single industry or profession and designed to speak for those interests with essentially one voice. These constraints, the United States Supreme Court has concluded, require strict limits on the uses to which their members' mandatory dues may be put. (*Keller, supra,* 496 U.S. at pp. 13-16 [110 L.Ed.2d at pp. 13-16]; *Abood, supra,* 431 U.S. at pp. 233-236 [52 L.Ed.2d at pp. 283-285].)

A university is different; its interests are not narrowly vocational, but broadly educational; its mission is centered not on the goal of representing an industry or a profession, but on the concept that intellectual growth and fulfillment require a "wide exposure to that robust exchange of ideas which discovers truth 'out of a *multitude of tongues* . . . .' " (*Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603 [17 L.Ed.2d 629, 640, 87 S.Ct. 675], italics added.) The dissemination of often controversial and even disagreeable ideas goes to the very heart of the university experience. Application of the mandatory fee to the communication of such ideas furthers goals that are not only "germane" (*Abood, supra,* 431 U.S. at p. 235 [52 L.Ed.2d at p. 284]) but integral to the University's educational objectives.

Accordingly, subject to the limitations set forth below, I would hold that the exaction and use of the mandatory student fee to support student government and activities is consistent with the First Amendment and Supreme Court precedent.

B. *Constitutional Background*

Although this case raises constitutional issues in a context not heretofore considered by this or the United States Supreme Court, our analysis is informed by existing precedent.

At the outset, it is important to recognize, as the United States Supreme Court has observed, that we confront "delicate issues concerning the academic community." (*Healy* v. *James* (1972) 408 U.S. 169, 171 [33 L.Ed.2d 266, 273-274, 92 S.Ct. 2338].) Contemporary concerns over "political correctness" notwithstanding, the American university remains among the world's freest forums for intellectual inquiry and debate. We must approach our task, therefore, "with special caution" (*ibid.*), understanding that the institution's continued vitality and independence are contingent upon its freedom from disruptive judicial interference.

Restraint does not imply complaisance, however. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (*Tinker* v. *Des Moines Independent School Dist.* (1969) 393 U.S. 503, 506 [21 L.Ed.2d 731, 737, 89 S.Ct. 733].) Indeed, as the high court has written, "the precedents of this Court leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' " (*Healy* v. *James, supra,* 408 U.S. at p. 180 [33 L.Ed.2d at p. 279], quoting *Shelton* v. *Tucker* (1960) 364 U.S. 479, 487 [5 L.Ed.2d 231, 236-237, 81 S.Ct. 247].) Thus, far from dulling our powers of review, the University's unique status as a forum for free expression impels a sharpened judicial scrutiny, sensitive to both institutional interests and the constitutional rights of the individual.

Plaintiffs contend that their First Amendment guarantees of free speech and association have been violated by the University through the imposition and use of the mandatory student fee. More particularly, they oppose as *compelled* speech and association the University's allotment of a portion of their student fees to the Associated Students of the University of California (ASUC), for the purpose of financing the advocacy of political and ideological views which they reject. They also contend that the Regents lack the authority to impose a mandatory student fee. I shall address the constitutional claim first, as it constitutes by far the more weighty and serious challenge.

Although on its face the First Amendment protects neither the right of association nor the right to be free from compelled speech and association, both rights are now well established in our jurisprudence. The United States Supreme Court has declared that the activities expressly protected by the First Amendment—to speak, assemble, petition for redress of grievances and exercise one's religion—encompass a complementary right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 622 [82 L.Ed.2d 462, 474, 104 S.Ct. 3244].) This right of expressive association, in turn, "presupposes a freedom not to associate." (*Id.* at p. 623 [82 L.Ed.2d at p. 475].) Similarly, the high court has held that the First Amendment right to speak implies a corresponding right to "refrain from speaking." (*Wooley* v. *Maynard* (1977) 430 U.S. 705, 714 [51 L.Ed.2d 752, 762, 97 S.Ct. 1428].) As the Supreme Court in the landmark case of *Board of Education* v. *Barnette, supra,* 319 U.S. 624, 631 [87 L.Ed.2d 1628, 1634], declared, the Constitution guarantees the individual freedom from "compulsion . . . to declare a belief."

## C. *Compulsory Dues Under the First Amendment*

These principles have been extended by the Supreme Court to prohibit the state from exacting compulsory contributions to unions for purposes not germane to the collective bargaining process. The pivotal case in this area is *Abood, supra,* 431 U.S. 209. There, the Supreme Court recognized that state laws authorizing unions and management to enter into "agency shop" agreements requiring every employee, whether or not a member of the union, to pay the union a service charge, impinge upon the employee's right to be free from compelled speech and association. Nevertheless, the court concluded that any interference with the employees' First Amendment rights was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." (*Id.* at p. 222 [52 L.Ed.2d at p. 276].) At the same time, however, the court found meritorious the argument that employees "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." (*Id.* at p. 234 [52 L.Ed.2d at p. 283].)[2]

*Abood, supra,* 431 U.S. 209, did not prohibit a union from spending funds for the expression of political views unrelated to its collective bargaining function; it merely held that dissenting employees may not be coerced into financing such activities. (*Id.* at p. 235 [52 L.Ed.2d at pp. 284-285].) Nor did *Abood* attempt to formulate a standard for distinguishing between collective bargaining activities and undertakings unrelated to collective bargaining, or to prescribe the procedures necessary to ensure that objecting employees did not finance such nongermane speech. (*Id.* at p. 236 [52 L.Ed.2d at p. 285].) Subsequently, however, in *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883], the high court declared that a union activity may be financed out of compulsory dues if it is *"normally or reasonably employed to implement or effectuate"* the union's duties as exclusive bargaining representative. (*Id.* at p. 448 [80 L.Ed.2d at p. 442], italics added.) And in *Chicago Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066], the court held that "the constitutional requirements for the

---

[2]*Abood* represented the culmination of a line of decisions beginning with *Railway Employes' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714] and progressing through *Railway Clerks* v. *Allen* (1963) 373 U.S. 113 [10 L.Ed.2d 235, 83 S.Ct. 1158] and *International Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784] in which the court upheld federal legislation authorizing union shop agreements and the imposition of compulsory dues on the grounds that it promoted industrial peace and distributed fairly the cost of union activities to those who benefit, but reserved the constitutional questions posed by the expenditure of mandatory dues for purposes not germane to collective bargaining.

Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." (*Id.* at p. 310 [89 L.Ed.2d at p. 249].)

Recently, in *Keller, supra,* 496 U.S. 1, the United States Supreme Court extended the *Abood* analysis to an integrated state bar, reaffirming its earlier conclusion in *Lathrop* v. *Donahue* (1961) 367 U.S. 820 [6 L.Ed.2d 1191, 81 S.Ct. 1826], that the exaction of compulsory bar dues does not per se violate an individual's rights, but holding that the First Amendment prohibits the expenditure of members' dues on speech unrelated to the regulation of the legal profession. Reasoning by analogy from *Abood* and its progeny, the high court acknowledged the integrated bar's impingement on members' First Amendment rights, but held that the compelled association was "justified by the State's interest in regulating the legal profession and improving the quality of legal services." (*Keller, supra,* 496 U.S. at pp. 13-14 [110 L.Ed.2d at p. 14].) It followed that the California State Bar may constitutionally fund speech "germane" to these goals, i.e., "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of . . . legal service,' " but may not finance "activities of an ideological nature which fall outside of those areas of activity." (*Id.* at p. 14 [110 L.Ed.2d at p. 14].) While declining to define "[p]recisely where the line falls," the high court nevertheless observed that "the extreme ends of the spectrum are clear: Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the Bar or proposing ethical codes for the profession." (*Id.* at pp. 15-16 [110 L.Ed.2d at p. 15].)

Neither *Abood* nor *Keller* addressed directly the constitutional standard to be applied in balancing the state's interests in the collection and use of a mandatory fee against the infringement of associational rights occasioned thereby. In upholding the imposition of compulsory union dues in *Abood,* however, the high court referred to "*important* government interests" served by the union shop in the system of labor relations established by Congress. (431 U.S. at pp. 222, 225 [52 L.Ed.2d at pp. 275-276, 278], italics added.) Similarly, *Keller*'s discussion of the integrated state bar spoke in terms of "*substantial* public interests," and held that the expenditure of mandatory dues must be "necessarily or reasonably incurred for the purpose" of effectuating those interests. (496 U.S. at pp. 13-14 [110 L.Ed.2d at p. 14], italics added.) Interestingly, neither decision explicitly applied a strict scrutiny

standard, thus triggering the need for a compelling state interest and narrow legislative tailoring to accomplish the governmental objective. (See *Elrod* v. *Burns* (1976) 427 U.S. 347, 362 [49 L.Ed.2d 547, 559, 96 S.Ct. 2673].) One federal circuit court, as a result, has applied a middle-tier test to determine the constitutionality of mandatory student fees, inquiring whether the state interests served by the fees are sufficiently important or substantial to justify the First Amendment infringement. (*Carroll* v. *Blinken* (2d Cir. 1992) 957 F.2d 991, 999, cert. den. __ U.S. __ [121 L.Ed.2d 224, 113 S.Ct. 300] ["We . . . look to see whether the regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' "]; see also Cantor, *Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association* (1984) 36 Rutgers L. Rev. 3, 29-35 [hereafter Cantor]; but cf. *Galda* v. *Bloustein* (3d Cir. 1982) 686 F.2d 159, 164.)

Nevertheless, plaintiffs here maintain that strict scrutiny is the appropriate standard of review. They note that in *Chicago Teachers* v. *Hudson, supra,* 475 U.S. 292, the Supreme Court stated that a union's rebate procedures for dues expended in violation of *Abood* must be "carefully tailored to minimize the [First Amendment] infringement." (*Id.* at p. 303 [89 L.Ed.2d at p. 245].) And in *Elrod* v. *Burns, supra,* 427 U.S. 347, the court observed generally that a "significant impairment of First Amendment rights must survive exacting scrutiny." (*Id.* at p. 362 [49 L.Ed.2d at p. 559].)

Although suggestive, these statements in *Elrod* and *Hudson* are less than altogether persuasive, particularly in light of the high court's pointed failure to endorse a strict scrutiny standard in the two seminal decisions—*Keller, supra,* 496 U.S. 1, and *Abood, supra,* 431 U.S. 209—where one would reasonably expect it. I shall, accordingly, apply the standard expressly prescribed by the high court, inquiring whether the mandatory student fee serves "important" (*Abood, supra,* 431 U.S. at p. 225 [52 L.Ed.2d at p. 278]) or "substantial" (*Keller, supra,* 496 U.S. at p. 13 [110 L.Ed.2d at p. 14]) state interests, and whether the ASUC expenditures are "necessarily or reasonably incurred" (*id.* at p. 14 [110 L.Ed.2d at p. 14]) to effectuate those interests.[3]

### D. *Constitutionality of ASUC Expenditures*

With the foregoing principles in mind, I turn to the critical issues before us: What is the defining mission of the University for purposes of First

---

[3]In concluding that the mandatory student fee is subject to strict scrutiny, the majority simply ignore the fact that the United States Supreme Court expressly applied a middle-tier standard of review in the two leading mandatory dues cases, *Keller, supra,* 496 U.S. 1 and *Abood, supra,* 431 U.S. 209. However, even assuming for the sake of argument that strict scrutiny applies, I would hold that the mandatory student fee serves a compelling governmental interest, and is narrowly tailored to achieve its goal.

Amendment analysis under *Keller* and *Abood*, does that mission serve important state interests, and is the mandatory student fee reasonably employed to effectuate that mission? In resolving these questions, I shall consider the exaction and expenditure issues together, for, as *Keller* instructs, to define the interests which justify the imposition of a mandatory fee is to delineate the constitutional uses to which such funds may be put. (*Keller, supra,* 496 U.S. at p. 13 [110 L.Ed.2d at p. 14] [The First Amendment forbids the expenditure of mandatory dues for "ideological activities not 'germane' to the purpose for which compelled association was justified . . . ."].) Each of the parties', as well as the majority's, responses to these critical questions will be considered in turn.

(1) *Plaintiffs' Response*

Unfortunately, plaintiffs do not attempt to define the University's mission for purposes of delineating its funding limitations. They simply assert that any expenditure of the mandatory fee must be germane to "students in their capacity as students" and must exclude activities "political" or "controversial" in nature. Presumably implied in these assertions is some principle limiting the University's purpose to "student-oriented" or noncontroversial subjects. Regretfully, however, plaintiffs also fail to elaborate on these rather vague categories. "Students in their capacity as students" apparently excludes, for plaintiffs, any issue or activity which is pertinent to students as members of the "community" at large. Plaintiffs provide few specifics, but this would apparently *exclude* funding such groups as the League of Arab Students and the UC Polish Dance Club, since both routinely address subjects that transcend the University campus.[4] Plaintiffs would apparently permit the funding of speech related specifically to classes, curricula, athletics and perhaps tuition.

Obviously, there are a number of constitutional and practical problems with this approach. Plaintiffs do not explain, in terms of *Keller* and *Abood*, why the funding of the UC Rally Committee (which presumably relates to "students in their capacity as students") is constitutionally permissible, i.e, serves important or substantial state interests, but the funding of Berkeley Students for Peace does not. Nor do plaintiffs adequately explain why scores of student groups which speak to issues pertinent to both the campus and the world at large, like the Native American Student Association and Women in the Sciences, are not germane to the University's mission. Perhaps the most obvious problem with plaintiffs' argument, however (discussed more fully

---

[4]There was testimony, for example, that the League of Arab Students had used ASUC funds to distribute leaflets in support of the Palestine Liberation Organization, and the UC Polish Dance Club had used ASUC funds to sponsor speakers on current issues in Poland.

below), is that it denies support to groups, such as those previously mentioned, with much to contribute to the education of University students.

Plaintiff's additional (or possibly alternative) approach is to fund only those groups *not* engaged in what plaintiffs label "political" or "controversial" speech. Plaintiffs assert that *Abood* prohibits, at a minimum, compulsory contributions to political views which they oppose. However, there are legal and practical problems with this standard, as well. Contrary to plaintiffs' contention, *Abood* does not prohibit "political" speech per se. Indeed, the Supreme Court in *Abood* explicitly recognized that an agency shop may take "political" positions in furtherance of its collective bargaining function which its members may be compelled constitutionally to support. As the high court stated: "Union members in both the public and private sectors may find that a variety of union activities conflict with their beliefs. [Citation.] Nothing in the First Amendment or our cases discussing its meaning makes the question whether the adjective 'political' can properly be attached to those beliefs the critical constitutional inquiry." (431 U.S. at pp. 231-232 [52 L.Ed.2d at p. 282].) The critical question, rather, was whether the union used mandatory dues to "express political views unrelated to its duties as exclusive bargaining representative." (*Id.* at p. 234 [52 L.Ed.2d at p. 283].)

Plaintiffs also fail to define "political" in this context or relate it to "students in their capacity as students." An African-American student group which distributes leaflets asserting that the University discriminates against Blacks because it hires too few tenured Black professors is arguably engaged in speech relating to "students in their capacity as students." Yet the leaflet obviously implicates "political" and "controversial" issues relating to race, affirmative action, the validity of statistics to prove discrimination, and the like. Moreover, plaintiffs do not explain where "student" speech ends and "political" speech begins. When Students for a Better Understanding of China sponsors a film which reflects positively on the culture of mainland China, is it speech relating to "students in their capacity as students" or is it "political"? Speech that might seem perfectly innocuous to some could appear highly controversial to others, in this case perhaps to students from Taiwan. The most telling deficiency in plaintiffs' argument, however, is its failure, once again, to articulate any defining theory of the University's mission; accordingly, there is no attempt to explain why the aforementioned Chinese or African-American groups' speech is not germane to the University's mission, but the California Yell Leaders' exhortations are.

### (2) *The Majority's Response*

All of these flaws are manifest in the majority opinion, which concludes that at some undefined point the "educational benefits" of a student group's

speech becomes "incidental" to its "political or ideological interests," at which point funding from the mandatory fee becomes unconstitutional. The majority attempt to avoid all of the aforementioned difficulties inherent in this approach—not least of which is articulating meaningful standards for distinguishing between "educationally beneficial" and "political or ideological speech"—by referring the problem back to the Regents of the University (". . . they must ensure that the burdens are justified.") Having done so, the Regents must then institute a *"Hudson"* deduction (*Chicago Teachers* v. *Hudson, supra,* 475 U.S. 292) permitting students to deduct that portion of their mandatory fee budgeted for "political or ideological" activities.

This analysis is wholly untenable. As a practical matter, it raises a host of unanswered and unanswerable questions; as a legal ruling, it places the University in an impossible position. For example, is a film sponsored by the Chinese Students Association depicting the recent events at Tiananmen Square "educational" or "political"? The majority do not even provide a means of analyzing the question, much less of finding an answer. How would the majority characterize a student-sponsored forum on affirmative action in the University's admissions process, or a leaflet urging the University to divest its holdings in South Africa, or a speaker on the environmental ramifications of logging old-growth timber? Absent any meaningful standards in the majority opinion, how is the University possibly to characterize these activities? And how, moreover, is it to deal with the inflammatory consequences of labeling some groups "educationally beneficial" and therefore eligible for funding through the mandatory fee, while listing others as "political" and therefore ineligible? However the University decides, it will face a renewed barrage of legal challenges.

Perhaps in tacit recognition of these intractable problems, the majority observe that the University is "free" to adopt "another" undefined method of funding, so long as it avoids the constitutional infirmities of funding "political" speech. The irony of the majority's solicitude for academic "freedom" in a decision which does irreparable damage to that principle will not be lost on the reader. In any event, the majority's holding thus comes to this: Expression on campus contributes to the educational mission of the University, but *not* if the "political or ideological" content of the expression exceeds its "educational benefits"; the majority refuse, however, to define this dichotomy; the Regents are in no position to do so; therefore, on remand the Regents may consider "another" method of funding.

Such reasoning does not do this court credit. If the majority cannot define its own standard, it should not ask the University to do so. And if the University is free, as the majority acknowledge, to impose a mandatory fee

for certain "educationally beneficial" speech, then it should not be forced, in effect, to adopt an all-voluntary system. For that is the only practical alternative, short of defiance, left to the University: Abolish the student fee, or adopt a "check-off" system which permits each student to contribute to the groups of his or her choice. In either case, funding will soon devolve into a political *popularity* contest. Thus, in a setting where provocative ideas should receive the most support and encouragement, precisely the opposite will occur; student groups will be subject to an ideological referendum, and the most marginal groups will receive the least financial assistance. This is truly Orwellian.

### (3) *The University's Mission*

The University, for its part, submits that its overarching purpose is "to educate" students, and contends that it may constitutionally support activities which further this expansive goal. Student government, lobbying and extracurricular activities groups, the University argues, serve important educational interests by training students in self-government, providing an organized forum to discuss and debate public issues of the day, exposing students to a multiplicity of cultural and political viewpoints and developing social and rhetorical skills.

The University is undoubtedly correct that its essential mission is "to educate" and that student government and extracurricular activities supplement this worthy goal. "Education" is unquestionably a valuable end in itself. But the constitutional issue is whether the University's mission serves an important *state* interest, and whether the funding of student groups engaged in speech which plaintiffs oppose serves reasonably to effectuate that interest. As explained below, I conclude that both questions must be answered in the affirmative.

That the state derives important benefits from an informed and enlightened citizenry is a proposition almost too familiar to warrant discussion. Political and educational philosophers from Plato to Thomas Jefferson and John Dewey have observed that the principal object of education is to prepare youth for the fullest participation in society. In teaching the *student* the university is simultaneously training the *citizen*. Indeed, they are but two sides of the same coin. To perform responsibly not just as citizen, but as worker, family member, friend and neighbor, a student must acquire both knowledge as well as the critical power of choice and self-direction. A liberal education consists of more than simply achieving an acquaintance with the great poets, philosophers, scientists and statesmen, although that is assuredly an important element; it is also learning the arts of investigation,

criticism, discrimination and communication, skills which facilitate a life-time of learning and social participation.

The work of a university cannot, therefore, be measured strictly in terms of courses, curricula, and examinations. Dewey wrote, "The only way to prepare for social life is to *engage* in social life." (Dewey, Moral Principles in Education (1909), p. 14, italics added.) As valuable as the pursuit of knowledge is for its own sake, the university also has a major responsibility for the development of an enlightened and engaged citizenry. Neglect this duty, and apathy and incivility will surely result.

Thomas Jefferson spoke often of the critical role higher education plays in preserving a republic of free, informed and self-reliant citizens. As he observed in characteristically pithy fashion: "If a nation expects to be ignorant and free, in a state of civilization, it expects what never was and never will be."[5] Consistent with these views, Jefferson considered the founding of the University of Virginia to be among his most notable legacies, for the future of the nation ultimately depended on the knowledge and civic values of each succeeding generation. As the United States Supreme Court recently observed: "Each generation must learn anew . . . the ideas and aspirations" which the Constitution's written terms embody. (*Planned Parenthood* v. *Casey* (1992) 505 U.S. __ , __ [120 L.Ed.2d 674, 730 112 S.Ct. 2791, 2833.] Foremost among these "lessons" is the importance of toleration. "To endure the speech of false ideas . . . and then to counter it is part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." (*Lee* v. *Weisman* (1992) 505 U.S. __ , __ [120 L.Ed.2d 467, 483 112 S.Ct. 2649, 2657.]

Although these thoughts are conventional, their implications for the constitutional issues before us are significant. For if, as I believe, the nation's fundamental civic values are forged in the intellectual fires of its college campuses, then clearly the University's educational mission serves an important if not compelling governmental interest. And if, as I further believe, the ability to form and express one's own opinions and tolerate those of others lies at the heart of a free society, then the mandatory student fee clearly serves to effectuate this transcendent national interest, by contributing to the nearly limitless variety of speech and opinion on the university campus.

Without such funding, moreover, I have no doubt that the campus would lose much of the diversity which is its lifeblood. The practical realities cannot be ignored. The wherewithal to fund even a modest program lies

---

[5]The Great Quotations (Seldes ed. 1983) page 367.

beyond the limited means of most student groups. Remove the mandatory fee and centralized ASUC distribution, and funding would rapidly become a balkanized affair dependent on the vicissitudes of private donations and the fortuity of wealth. By divorcing the University from the funding process, furthermore, "students would cease to be linked by a common bond to the tolerant support of all points of view." (*Carroll* v. *Blinken, supra,* 957 F.2d at p. 1002.) Therefore, I conclude that the modest mandatory fee which affords every student group the opportunity to sponsor films and speakers, to produce and distribute leaflets and flyers, is a reasonable and necessary means of effectuating the University's vital national mission.

Obviously, not all of the speech and activities funded by the mandatory student fee will be agreeable to all of the students all of the time. However, as *Keller* and *Abood* instruct, the critical question is not whether speech is controversial or commands the assent of every student, but whether it serves reasonably to effectuate the University's compelling educational mission. Subject to the limitations set forth below, I would hold that it does.[6]

### E. *Restrictions on the Use of the Mandatory Fee*

The University's discretion to fund student activities through the mandatory fee is not without limit. On the contrary, as noted earlier the interests that justify the mandatory fee define the uses to which it may legitimately be put. The University's goal is to encourage a diversity of expression on campus, not to promote a particular ideological orthodoxy or partisan agenda. As the University's own policies provide, therefore, funding of student government and student activities groups and operations must be neutral and must not be used to support political candidates or ballot measures. Indeed, the use of such funds for partisan political purposes would violate the strictures of our holding in *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 209-210 [130 Cal.Rptr. 697, 551 P.2d 1], that absent "clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign."[7]

Nor should the mandatory fee be used to support student activities groups engaged in expressive activities *off campus*, including the currently funded

[6]I note, in passing, that infringements of the nature at issue here occur routinely at a university; indeed, they can hardly be avoided. When a university hires a professor based, in part, on his or her academic philosophy, when it selects courses for inclusion in the curriculum, when it invites speakers from outside the academic community to address issues of public interest, it necessarily expends funds provided by students to promote speech and ideas which some students may oppose. (See *Kania* v. *Fordham* (4th Cir. 1983) 702 F.2d 475, 480, fn. 9.) So long as the university neither seeks by these expenditures to impose a particular ideological orthodoxy nor to stifle intellectual debate, such educational judgments cannot justifiably be questioned.

[7]Although the trial court found "isolated instances in the past" where the rule against funding partisan activities had been violated, it concluded that the relatively few infractions

ASUC lobbies. The purpose of the mandatory fee is to expose students to a diversity of views and to facilitate direct student participation in the University's ongoing intellectual discourse. Off-campus expression may be just as educational as on-campus speech for those involved, but the critical difference is that it benefits *only* those involved; it does not contribute to the campus discussion of ideas, and other students do not have the opportunity to hear and debate the views of off-campus speakers.[8]

Finally, inasmuch as the purpose of the University is to serve as a "marketplace of ideas" in which students are encouraged to speak and participate, any use of the mandatory fees to *interfere* with such expression would also exceed the constitutional mandate. Thus, the University may properly deny funds to any group or activity which violates reasonable time, place and manner regulations or otherwise threatens to disrupt the educational process. As the United States Supreme Court has stated, "Associational activities need not be tolerated when they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." (*Healy* v. *James, supra,* 408 U.S. 169, 189 [33 L.Ed.2d 266, 284].) For example, the funding of activities designed to deny access to a particular course or professor would exceed the constitutionally permissible uses of the mandatory student fee. And when advocacy presents an imminent threat to campus order through the promotion of racial genocide, for example, the University may properly deny recognition and funding. (*Id.* at pp. 189-192 [33 L.Ed.2d at pp. 284-286].)

### F. *The Case Law Concerning Mandatory Student Fees*

The foregoing analysis is consistent with *every reported decision* involving First Amendment challenges to the collection and use of a general mandatory student activities fee. Indeed, it closely tracks that of Judge Kaufman for the Second Circuit Court of Appeals in the most recent decision to date,

and the absence of any "pattern of neglect or likelihood of recurrence" militated against equitable relief. The award of declaratory or injunctive relief is entrusted to the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840]; *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911].) The test is whether the trial court "exceeded the bounds of all reason, all of the circumstances before it being considered." (*In re Marriage of Connolly, supra,* 23 Cal.3d at p. 598; see Code Civ. Proc., §§ 1060, 1061.) Here, in light of the findings that the infractions relating to partisan funding were de minimis and would not be repeated, I cannot say that the trial court clearly abused its discretion in denying relief.

[8]Off-campus activities that are not designed to facilitate speech in any meaningful sense, such as travel expenses incurred by the Berkeley Chess Club to attend a chess match at another campus, may continue to be funded as they do not raise First Amendment concerns relating to compelled speech.

*Carroll* v. *Blinken, supra,* 957 F.2d 991, 1001, certiorari denied __ U.S. __ [121 L.Ed.2d 224, 113 S.Ct. 300]. There, state university students sought to enjoin as unconstitutional under *Keller* and *Abood* the use of a portion of their mandatory student fee ($55 per semester) to fund a particular student organization, the New York Public Interest Research Group (NYPIRG). There, as here, the federal court noted that the mandatory fee was used to fund a great variety of student groups, "including athletic, social, recreational, service, ethnic and political organizations." (*Id.* at p. 993.) While acknowledging the First Amendment intrusion on dissenting students, the Court of Appeals concluded that the University's mission amply justified the infringement. "A university where NYPIRG petitions against nuclear power, where environmental groups advocate greater recycling, where opponents of South Africa debate opponents of divestment, and partisans of a dozen other causes press their cases is a university fulfilling its traditional mission in a free society. Were it otherwise, college would be a very quiet, intellectually diminished and ultimately irrelevant place." (*Id.* at p. 1001.)[9]

Although the federal court thus upheld the use of the mandatory fee to support NYPIRG's on-campus activities, it disallowed the use of such funds for its off-campus lobbying and statewide administrative costs. As the court explained: "Students opposed to NYPIRG can be made to tolerate some compromise of their First Amendment rights when the benefits of a varied extracurricular life, hands-on civics training, and robust campus debate are all around them to approvingly take part in, actively oppose, or merely witness dispassionately firsthand. [Citations.] These benefits vanish when NYPIRG money is spent in the halls of the state legislature or at the main offices in New York City. SUNY Albany's interests, however substantial, are still, after all, those of the university and its community, not that of an independent statewide organization." (*Carroll* v. *Blinken, supra,* 957 F.2d at p. 1002.)[10]

*Kania* v. *Fordham, supra,* 702 F.2d 475 also involved a challenge by state university students from the University of North Carolina to the use of their

---

[9]Contrary to the implication in the majority opinion, the Court of Appeals in *Carroll* did not premise its holding on the fact that NYPIRG promoted "educational" rather than "ideological" causes. On the contrary, the *Carroll* court recognized that despite its self-description as "non-partisan" NYPIRG pursued clearly political ends, as did the "partisans of a dozen other causes" on campus. (957 F.2d at p. 1001.) Nevertheless, the court concluded that such groups were integral to the university's goal of "fulfilling its traditional mission in a free society." (*Ibid.*)

[10]The majority are correct that the *Carroll* court "balanced" the benefits that NYPIRG and other activities groups offered to students against the infringement of the dissenting students' rights. But contrary to the majority's implication, the *Carroll* court weighed the balance in favor of the university, holding that funding such "athletic, social, recreational, service, ethnic and political organizations" served sufficiently important interests to justify the infringement. (957 F.2d at p. 993.)

mandatory student fees. Relying on *Abood*, the students charged that the partial funding of a student newspaper compelled them to support views with which they disagreed, in violation of the First Amendment. The federal circuit court rejected the challenge, holding that "funding by mandatory student fees is the least restrictive means of accomplishing an important part of the University's central purpose, the education of its students." (*Id.* at p. 480.) In this regard, the court noted a "crucial distinction between *Abood* and the present case" lay in the fact that the "mandatory fees in *Abood* . . . enhanced the power of one, and only one, ideological group to further its political goals. In contrast, [the student newspaper] increases the overall exchange of information, ideas, and opinions on the campus." (*Ibid.*)

Although rendered prior to *Keller* and *Abood*, a number of state decisions have also rejected First Amendment challenges to the use of mandatory student fees. In *Larson v. Board of Regents of University of Neb.* (1973) 189 Neb. 688 [204 N.W.2d 568], state university students relied on an important predecessor to *Abood*, *International Machinists v. Street, supra*, 367 U.S. 740,[11] to challenge as unconstitutional the use of mandatory student fees to fund the student newspaper and speakers program, alleging that the "mandatory fee system require[d] them to contribute to the support of political views and doctrines with which they disagree[d]." (204 N.W.2d at p. 570.) Applying what was for all intents and purposes an *Abood* analysis, the Nebraska Supreme Court rejected the claim, concluding there were "important distinction[s] between the political activities of a labor union and extracurricular activities at a university." (*Ibid.*) "Within reasonable limits, it is appropriate that many different points of view be presented to the students." (*Id.*, 204 N.W.2d at p. 571.)

*Lace v. University of Vermont* (1973) 131 Vt. 170 [303 A.2d 475] is similar. There, state university students alleged that the use of their mandatory student fee, which funded over 100 student activities groups, a speakers bureau and the campus newspaper violated their First Amendment rights by compelling them to support " 'persons advocating positions and views with which they wholly disagree.' " (*Id.* at p. 477.) Distinguishing the labor union situation, the Vermont Supreme Court upheld the expenditures as a means of encouraging "various and divergent student organizations to inject a spectrum of ideas into the campus community." (*Id.* at p. 479.) And in *Good v. Associated Students of Univ. of Washington* (1975) 86 Wn.2d 94 [542 P.2d 762], the Washington Supreme Court rejected a similar First Amendment challenge, holding that the use of a mandatory student fee to support a campus speakers bureau, student resolutions on contemporary political issues and other extracurricular activities groups served the paramount educational goal of promoting "an infinite range of ideas, theories and beliefs."

---

[11]See footnote 2, *ante*, at page 875.

(*Id.*, 542 P.2d at p. 769; see also *Arrington* v. *Taylor* (M.D.N.C. 1974) 380 F.Supp. 1348, 1364 [distinguishing the use of mandatory student fees to provide "a forum wherein others may express their views" from the use of mandatory dues by a state bar or labor union]; *Veed* v. *Schwartzkopf* (D.Neb. 1973) 353 F.Supp. 149, affd. without opinion, 478 F.2d 1407 (8th Cir. 1973), cert. denied (1974) 414 U.S. 1135 [38 L.Ed.2d 760, 94 S.Ct. 878] [university is not constitutionally prohibited from use of mandatory student fees to support student association, newspaper and speakers program which provide a forum for the expression of divergent opinions]; see also Cantor, *supra*, 36 Rutgers L. Rev. at pp. 46-51; Note, *"Fee Speech": First Amendment Limitations on Student Fee Expenditures* (1984) 20 Cal. Western L. Rev. 279; Gibbs & Crisp, *The Question of First Amendment Rights vs. Mandatory Student Activities Fees* (1979) 8 J. L. & Ed. 185.).)

*Galda* v. *Rutgers* (3d Cir. 1985) 772 F.2d 1060, on which plaintiffs chiefly rely, is inapposite. There, the court held that a separate mandatory fee imposed for the sole purpose of supporting one organization, the New Jersey Public Interest Research Group (NJPIRG), which was otherwise *ineligible* to receive money from the general student activities fee because it was an independent rather than a student organization, infringed the plaintiffs' First Amendment rights. In so ruling, however, the *Galda* court emphasized that its holding was "a narrow one and may perhaps best be explained by eliminating what is not at stake. *This case does not address the problem presented by a state university's allocation of a mandatory non-refundable student activity fee.* We are not concerned here with the question whether an organization with [NJ] PIRG's philosophic outlook may be funded through the general activities fund as are other campus organizations representing diverse views. [¶] In short, we do not enter the controversy on whether a given campus organization may participate in the general activities fee despite the objections of some who are required to contribute to that fund. See, e.g., *Kania* v. *Fordham*, 702 F.2d 475 (4th Cir. 1983 . . . ." (*Id.* at p. 1064, italics added.)

*Galda* v. *Rutgers, supra,* 772 F.2d 1060, held only that a separate assessment to support *one* organization which expressed only *one* viewpoint violated the First Amendment rights of dissenting students. In so holding, it again emphasized the distinction between the special funding of NJPIRG, and the traditional funding of campus groups through a general student activities fee. As the court explained: "There is room for argument that a university's role of presenting a variety of ideas *is a sufficiently compelling reason for some infringement of First Amendment rights just as is the need for labor peace in the union dues cases.* That contention loses its force, however, when an outside organization independent of a university and dedicated to

advancing one position, is entitled to compelled contributions . . . . In that situation a university's ability to insure a balance in access is infringed, if not prevented, in some circumstances and the quid pro quo for payment to a forum disappears. [¶] Generally, when an activity fund comes into existence, all student groups on campus are free to compete for a fair share. That is not the situation here where the mandated contribution is earmarked for only one organization, an organization which has no obligation to use any part of the fund for the benefit of a group which pursues a different philosophy." (772 F.2d at p. 1067, italics added.)

We are not confronted here with a separate mandatory assessment earmarked for one independent organization, but rather a general student activities fee in which "all student groups on campus are free to compete for a fair share." (*Galda* v. *Rutgers, supra,* 772 F.2d at p. 1067.) Thus, as *Galda* itself repeatedly emphasizes, that case is not apposite to our decision.[12]

## G. *Constitutionally Compelled Administrative Procedures*

The analysis does not end with the conclusion that certain activities may be funded through the mandatory student fee and others may not. As noted earlier, the United States Supreme Court has outlined a minimum set of procedures by which a union or integrated bar may meet its constitutionally compelled requirement of assuring that compulsory dues are not expended on nongermane activities. The high court summarized these procedures in *Chicago Teachers* v. *Hudson, supra,* 475 U.S. 292, as follows: "[T]he constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker, and an escrow for the amounts reasonably in dispute while such challenges are pending." (*Id.* at p. 310 [89 L.Ed.2d at p. 249]; see *Keller* v. *State Bar, supra,* 496 U.S. at pp. 16-17 [110 L.Ed.2d at pp. 15-16]; see also *Gibson* v. *The Florida Bar* (11th Cir. 1990) 906 F.2d 624, 627-633, cert. granted Mar. 18, 1991, cert. dism. as improv. granted Dec. 4, 1991.)

As discussed above, the University's discretion to fund student activities through the mandatory fee is not without constitutional limits. These include expenditures to support partisan political candidates or ballot measures, off-campus activities, and activities which interfere with the freedom of expression of other members of the campus community. Students who

---

[12]In light of *Galda*'s clear, repeated and unequivocal statements that it was *not* considering the problem represented by a general student activities fee (772 F.2d at p. 1064), and its intimation that it would *uphold* such a fee if the issue were presented (*id.* at p. 1067), the majority's statement (maj. opn., *ante,* at p. 858) that "there is nothing in the Third Circuit's approach that prevents its application to on-campus student groups" defies comprehension.

believe that a proposed expenditure violates these constitutional restrictions should have a convenient and expedient means of challenging it. Although we do not have a fully developed record regarding the University's fee setting and collection process, I believe, as the high court observed in *Keller*, *supra*, 496 U.S. 1, that the University "could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*." (496 U.S. at p. 17 [110 L.Ed.2d at p. 16].) I note in this regard that the ASUC already prepares a detailed annual budget, including line item expenditures of student activities groups, which must be reviewed and approved by the ASUC Senate and the University. An appropriate remedial system would provide for general notice of the approved budget, the opportunity to file a written objection to a particular expenditure within a specified time period, an escrow for the pro rata amount of the objecting students' fees at issue pending determination of the merits of the objection, and an impartial arbitration panel. (See *Gibson* v. *The Florida Bar, supra*, 906 F.2d at pp. 627-632.) As in *Keller*, however, I would leave open the question whether one or more alternative procedures tailored to the University's unique conditions would likewise satisfy its constitutional obligations. (496 U.S. at p. 17 [110 L.Ed.2d at p. 16].)

## H. *Authority to Impose the Student Fee*

Plaintiffs also assert that the University lacks the requisite statutory and constitutional authority to impose a mandatory student activities fee. Several grounds are advanced to support this claim. As will appear, none is meritorious.

Originally created by statute in 1867 (Stats. 1867-1868, ch. CCXLIV, p. 248), the University of California achieved constitutional status in 1879. (Cal. Const., art. IX, § 9.) The California Constitution declares the University of California to be a "public trust" and places its governance in the hands of the Regents. (Cal. Const., art. IX, § 9, subd. (a).) The Regents are vested with "the legal title and the management and disposition of the property of the university . . . ." (Cal. Const., art. IX, § 9, subd. (f).) The Regents' authority includes "all the powers necessary or convenient for the effective administration of its trust, including the power . . . to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise. . . ." (*Ibid.*) The courts have construed this constitutional authority as giving the Regents "virtual autonomy in self-governance." (*Regents of University of California* v. *City of Santa Monica* (1978) 77 Cal.App.3d 130, 135 [143 Cal.Rptr. 276]; accord, *Cal. State Employees' Assn.* v. *Regents of University of California* (1968) 267 Cal.App.2d 667, 671 [73 Cal.Rptr. 449].) As we have stated: "[T]he power

of the Regents to operate, control and administer the University is virtually exclusive." (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277], internal quotation marks omitted.)

In light of these provisions, plaintiffs' assertion that the University lacks the requisite authority to impose a mandatory student fee is patently without merit. The Legislature has expressly authorized the creation of a student body organization and the collection of mandatory student activities fees for the California State University system. (Ed. Code, § 89300.) The funds collected may be used "for such purposes of the student body organization as are approved by the trustees." (Ed. Code, § 89302.) Although parallel statutory provisions are not provided for the University, none is needed. The University is a constitutional entity whose powers derive therefrom. The Regents' authority to exercise "all the powers necessary or convenient for the effective administration of its trust, including the power . . . to delegate to its committees or to the faculty of the university, or to others, such authority or functions, as it may deem wise. . . ." (Cal. Const., art. IX, § 9, subds. (a), (f)) plainly encompasses the power to authorize the adoption, by a vote of two-thirds of the student body, a mandatory activities fee similar to that of the state college system.

Plaintiffs further contend that the Regents have exceeded their constitutional mandate by delegating to the ASUC, which they characterize as a "private entity," the authority to administer and manage the student funds. On the contrary, the ASUC is clearly a creature of the University; the Regents authorized it, and retain ultimate responsibility for its supervision of student affairs. The chancellor, by virtue of the authority of the Regents, regularly monitors the ASUC Senate and oversees and approves the annual ASUC budget. Moreover, under the University's written policies, the chancellor is empowered to "make audits of the finances of student governments, exercise control over expenditure of their funds . . . and where necessary may take action to ensure that any activity under control of student governments is operated in accordance with sound practices . . ." Thus, the ASUC plainly acts under the authority and close supervision of the Regents and the University.

Relying on this court's decision in *Stanson* v. *Mott, supra,* 17 Cal.3d 206, petitioners further contend that the University lacks clear and explicit authority to use public funds for partisan campaign purposes. *Stanson* held that a public agency requires "clear and explicit" legislative authority to engage in what it characterized as "informational" lobbying (*id.* at pp. 209-210), and suggested, without holding, that the use of public funds for partisan campaigning presented a "serious constitutional question." (*Id.* at p. 219.) Applying these principles, we held that the Director of the California Department of Parks and Recreation had exceeded his authority in authorizing the

expenditure of more than $5,000 of public funds to promote passage of a bond issue for the acquisition of park land and recreational facilities. (*Id.* at p. 220.)

Although the ASUC Senate may adopt resolutions on political issues, the University does not sanction the expenditure of ASUC revenues to fund partisan election campaigning. Moreover, as previously noted, there is clear and express constitutional authority authorizing the expenditure of funds for the ASUC student government. (Cal. Const., art. IX, § 9, subd. (f).) *Stanson v. Mott, supra,* 17 Cal.3d 206, is thus inapposite.

Plaintiffs also assert that use of the mandatory activities fee to subsidize student religious groups violates the establishment clause (U.S. Const., Amend. I; Cal. Const., art. I, § 4.) and article IX, section 9, subdivision (f) of the California Constitution, which states that the University "shall be entirely independent of all political or sectarian influence . . . ." As earlier noted, the trial court made a factual finding, sustained by the record, that while some religious groups had registered with the University, no group whose activities are essentially religious in nature, i.e., devoted to proselytizing, conducting religious services or restricting membership to persons of a particular faith, had received ASUC funds. Nor has the University violated the constitutional injunction against political "influence." This section, by its terms, proscribes partisan interference in the internal affairs of the University, not political activity by the University. Moreover, as previously discussed, the ASUC may not fund activities designed to advance partisan political positions. Thus, the mandatory student fee does not contravene the political neutrality clause.[13]

## CONCLUSION

The Reverend Martin Luther King, Jr., once said, "Morality cannot be legislated but behavior can be regulated. Judicial decrees may not change the heart, but they can restrain the heartless."

Our role as guardians of the law and of the Constitution charges us with the duty of safeguarding against unwarranted encroachments of others' rights by those who require restraint.

---

[13]Plaintiffs also cite section 13 of the Organic Act establishing the University of California (Stats. 1867-1868, ch. CCXLIV, § 13, p. 254), which provided in pertinent part: "[N]o sectarian, political or partisan test shall ever be allowed or exercised in the appointment of Regents, or in the election of professors, teachers, or other officers of the University, or in the admission of students thereto, or for any purpose whatsoever . . . ." Although the Organic Act was expressly incorporated into the 1879 version of article IX, section 9 of the California Constitution, a 1918 constitutional amendment deleted any reference thereto. Plaintiffs nevertheless urge that the provisions of the Organic Act remain in effect. Even assuming, without purporting to decide, that this is the case, the record is barren of any evidence that students are subject to "political, sectarian or political" tests for admission.

We are given here the solemn opportunity of enriching the spirit of liberty by shielding all persons against the imposition of an educational philosophy based on cynicism and divisiveness by fashioning a decree which fosters the concept of community as opposed to constructing a wall of separatism. This we have failed to do. We have lost the light of wisdom and diminished our noble heritage.

I acknowledge that the resolution of conflicting interests that I have set forth may not satisfy those who prefer First Amendment absolutes. I believe, however, that it is faithful to the principles of *Keller* and *Abood,* fair to both the University's and the nation's needs, and mindful of petitioners' right to be free of that compelled speech not germane to those concerns. Therefore, subject to the limitations previously discussed, I would affirm the judgment of the Court of Appeal.

Mosk, J., concurred.

Respondents' petition for a rehearing was denied April 15, 1993, and the opinion was modified to read as printed above. Mosk, J., and Arabian, J., were of the opinion that the petition should be granted.